IN THE UNITED STATES DISTRICT COURT
FOR DISTRICT OF KANSAS

**Dr. Justin Spiehs**

PLAINTIFF

v.

**Kelly Jones,** *in her individual capacity* as former USD497 President of the Board of Education the Lawrence Kansas School District
*

**Ronald Gordon-Ross** *in his individual capacity* as USD497 President of the Board of Education the Lawrence Kansas School District
*

**Jeanice Kerr Swift,** *in her individual capacity* as Superintendent of Schools Lawrence Public Schools
*

**Unified School District No. 497, Douglas County, Kansas**

DEFENDANTS

Case No.    5:25-cv-4089

Jury Trial Requested

# COMPLAINT

## OVERVIEW

### USD497 PROPERTY IS PUBLIC PROPERTY – IT BELONGS TO THE PEOPLE, NOT TO ANY ONE OFFICIAL

**1.** USD 497 property is public property – not the personal domain of any one individual. Yet Defendant Superintendent Jeanice Swift has exercised authority as though she governs a private estate, unilaterally and without legal basis banning individuals from public property, including Board meetings and other school-related events open to the public.

**2.** Superintendent Swift is not the legal owner, custodian, or controlling sovereign of USD 497 public facilities, nor does she possess unilateral authority under law to

1

permanently ban members of the public from traditional or designated public forums. Nevertheless, she has acted beyond her constitutional and statutory authority to silence and remove critics, targeting Plaintiff for his protected speech.

**3.** These actions constitute a misuse of governmental authority, violating the First Amendment rights of free speech and petition, and the Fourteenth Amendment guarantee of due process. Plaintiff's speech at open public meetings, conducted during his allotted time, was peaceful and related to matters of public concern – including school policies, library content, and board governance.

**4.** In retaliation for this protected speech, Defendants, acting under color of state law, issued a "No Trespass" ban, subject to ongoing review, enforced by armed law enforcement officers, and applied without notice, hearing, due process, or lawful justification.

**5.** These unconstitutional actions reveal a custom, policy, and practice of censorship, viewpoint discrimination, and retaliatory enforcement of speech restrictions – none of which were properly adopted by the Board in accordance with Kansas open meetings and policy requirements.

**6.** This lawsuit seeks declaratory, injunctive, and monetary relief for the violations of Plaintiff's constitutional rights under 42 U.S.C. § 1983, including damages and attorney fees as allowed under 42 U.S.C. § 1988.

### THE TWO-STRIKES-AND-THE-DEATH-PENALTY PRACTICE

**7.** Citizens who dare to speak candidly to USD 497 Board members – particularly when their speech exposes or embarrasses the district – do so at their own peril.

Merely repeating offensive or pornographic content from books in the district's own libraries can – and will – result in a lifetime ban, not only from Board meetings but from all USD 497 public property. The district has adopted an arbitrary, ad hoc "speech code" that allows speakers one so-called 'disrespectful' or 'ugly' word before issuing a vague and baseless "warning." These warnings are procedurally hollow: the speaker is never told what specific word or phrase violated what specific rule – because no such formally adopted rules exist. Upon uttering a second supposedly "foul" or "disrespectful" word – again, undefined – the speaker is immediately silenced. Their microphone is cut, their remaining speaking time forfeited, and they are expelled from the meeting – either by forced disconnection (for remote speakers) or under threat of physical removal by police. This lawsuit exposes that USD 497 does not possess lawful authority to impose such sweeping speech restrictions, especially when no formal policy has been debated or approved by a proper quorum of the Board. These unconstitutional practices reach even further: speakers are preemptively sanctioned when the presiding Board member merely anticipates they might say something disfavored. Even a speaker stating that they intend to quote from district-approved library books can trigger a warning, and a second such "offense" results in what amounts to a speech "death penalty" – removal from the meeting and the premises. The Board's reliance on vague, subjective terms like "disrespectful" speech – without clear standards or definitions – creates a viewpoint-based restriction that allows "respectful" (i.e., flattering or agreeable) speech while censoring dissent or

criticism on the same topic. Such selective enforcement is not only profoundly undemocratic – it is a blatant violation of the First Amendment.

**STUDENTS SHOULDN'T HEAR WORDS SPOKEN TO THE BOARD THAT THEY READ IN USD 497 LIBRARY BOOKS?**

**8.** The hypocrisy and pretext underlying USD 497's censorship practices are unmistakable. The Board insists that its unwritten "say-only-nice-words" and "no-bad-words" rules during public comment are necessary to preserve decorum because "students may be in attendance or watching online." This justification is political theater. The reality is that the very words and themes censored at board meetings are readily available to children as young as six through the district's own library collections. Those materials include graphic sexual content, including visual depictions of child sexual abuse, that are so explicit they cannot be fully described in this pleading. This contradiction exposes the district's true motive: not protecting minors, but silencing criticism of district policies. By allowing the same materials to circulate freely among students while punishing adults who read or reference them in a public forum, the Board has revealed that its policies are driven by viewpoint suppression, not child protection. Such selective enforcement is a direct violation of the First Amendment.

**9.** USD 497 enforces vague and arbitrary rules under the guise of regulating "obscenity," which it conflates with undefined "foul language." What qualifies as "foul" is left entirely to the subjective discretion of the presiding officer. The hypocrisy is stark: when members of the public read aloud verbatim passages from district-approved books containing profanity and sexual content, they are silenced. Yet those

4

same books are assigned to or made available for elementary school children. The Board's inconsistency is further illustrated by its treatment of speakers. On August 25, 2025, the Board allowed a speaker to read graphic depictions of sexual acts from library books. But when that same speaker attempted to cite objective statistics – such as the number of times vulgar words appeared in a specific book – the presiding officer abruptly censored the speaker and terminated the Webex connection before their allotted time expired. This selective enforcement demonstrates that the Board is not regulating "obscenity" at all, but dissent. It permits speech that does not challenge the Board, while censoring factual, critical speech that highlights the district's own choices. That is not a neutral rule of decorum – it is viewpoint discrimination, prohibited by the First Amendment.

### LAWRENCE POLICE ARE LITTLE MORE THAN ITS MEETING BOUNCERS FOR USD 497

**10.** Much like a private bar ejecting patrons with bouncers, USD 497 deploys the Lawrence Police Department as its armed enforcer of unwritten speech codes at public meetings. But unlike a bar owner, the Board does not act because of crime, intoxication, or genuine threats to safety. Instead, speakers are silenced and removed simply because the Board disapproves of their topics or word choices – speech that is fully protected by the First Amendment. By elevating the Superintendent to the role of judge, jury, and executioner, the Board has created a modern-day "Star Chamber," granting unilateral authority to impose "No Trespass" bans as if public officials enjoyed the same private-property rights as a landlord or business owner. In practice, this means officials claim the extraordinary power to permanently banish individuals

from all district property – even where those facilities are traditional or designated public forums open to every other member of the public.

**11.** This lawsuit exposes the fundamental legal error underlying USD 497's approach: a gross misunderstanding of the distinction between public property and private property in the law of trespass. Unlike private owners, government officials cannot exclude individuals from public forums based on disfavored speech. Criminal trespass laws do not provide school officials with carte blanche to silence critics or retaliate against dissent by converting public spaces into speech-free zones.

### INFORMING THE PUBLIC AND BOARD ABOUT THE PORNOGRAPHIC LITERATURE BEING GIVEN TO STUDENTS IS A MATTER OF GREAT PUBLIC CONCERN

**12.** This case does not arise in isolation. Plaintiff's experience mirrors those of other Kansas citizens who have been unconstitutionally censored at school board meetings. For example, Carrie Schmidt, a resident of Kansas and parent of a student in the Gardner school district, successfully challenged a similar ban. In *Schmidt v. Huff*, No. 25-CV-2081-EFM-GEB, 2025 WL 901335 (D. Kan. Mar. 25, 2025), Judge Eric Melgren ruled that Gardner's exclusion of Ms. Schmidt was unconstitutional.

**13.** Ms. Schmidt had been banned from Gardner school property after attempting to speak during the public-comment period. Judge Melgren held the ban unconstitutional, noting that Ms. Schmidt was prohibited from repeating words drawn directly from the district's own curriculum and library materials unless she specifically prefaced them by saying she was quoting from a book. Id. at *4.

**14.** Michael Eravi is a citizen journalist who has documented and challenged censorship in Kansas public meetings.

**15.** Dr. Justin Spiehs, likewise, is a citizen journalist who has frequently attended public meetings and reported on issues of public concern.

**16.** Like Ms. Schmidt, both Mr. Eravi and Dr. Spiehs were censored when they repeated words taken verbatim from books included in USD 497's own curriculum and libraries. Each was interrupted, sanctioned, or otherwise punished for reading the very language the district itself approved for students.

**17.** These experiences parallel the treatment of a Brevard County, Florida parent in *Moms for Liberty v. Brevard Pub. Sch.,* 118 F.4th 1324, 1331 (11th Cir. 2024), where a mother was interrupted and silenced by a board member before she could even begin her remarks. Courts have repeatedly condemned such arbitrary censorship as unconstitutional viewpoint discrimination.

**18.** Defendant USD 497 Board of Education governs the district and conducts its meetings as public forums, open to community members for comment on matters of public concern. The Board is bound by the First Amendment and cannot selectively silence critics while permitting other speakers to praise or support district policies.

<center>VAGUE AND UNCONSTITUTIONAL POLICIES</center>

**19.** The Board enforces speech restrictions at its public meetings that have never been formally adopted by a quorum vote, as required by Kansas law. Instead, these rules exist only as an unwritten custom and practice, applied arbitrarily by the presiding officer. One such unwritten policy is that words may be quoted directly from books in the district's libraries, but if the same words are spoken descriptively – without

<center>7</center>

expressly prefacing that they are a quotation – the speaker is censored, sanctioned, and removed.

**20.** This unwritten distinction has no basis in law or policy and serves only to suppress speech that criticizes or embarrasses the district. The result is a contradictory standard: speech that is verbatim from district-approved books is permitted when identified as a "quotation," but the same words, when used critically to describe those very books, are banned.

**21.** The Board does publish a general "Public Comment Policy," which sets forth a three-minute time limit for individual speakers and includes boilerplate restrictions on decorum. That policy provides:

> This is your time to share your opinions. However, public comment is not the appropriate forum for making complaints about specific staff or students. If your comments relate to complaints concerning students or staff, such complaints must be addressed to district staff as provided under Board Policies KN and GAE (General Complaints and Personnel Complaints). The board president or presiding officer of the meeting may direct that a public comment request be redirected to staff to comply with board policy, including and/or to protect the privacy of individual staff or students. If you need assistance in sharing a complaint or concern with district staff, let the board clerk or other district staff know.

> Topics discussed in public comment shall be germane to the business of the board. Furthermore, comments must comply with standards laid out in Board Policy GAAE and Board Policy JGECA (Antibullying and Hazing of Staff and Students). Comments or acts that are threatening to staff, the board, or others in attendance, including the use of language or behavior that is disruptive of the board meeting, will not be permitted during public comment. In addition, because students may be in attendance or watching online, members of the public will refrain from using foul or obscene language.

**22.** These restrictions are unconstitutionally vague, overbroad, and invite viewpoint discrimination:

"Complaints about specific staff or students": This clause prohibits negative or critical speech while permitting positive or laudatory speech about the same individuals – a textbook example of unconstitutional viewpoint discrimination. *See Ison v. Madison Local Sch. Dist. Bd. of Educ.,* 3 F.4th 887, 894–95 (6th Cir. 2021).

"Business of the Board": The term is undefined, providing no objective guidance. It grants unfettered discretion to the presiding officer to silence any disfavored speaker on the ground that their comments are not "germane." Such open-ended discretion is precisely what the Supreme Court has warned against in cases like *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 757 (1988).

"Foul or obscene language": This clause is not tethered to the narrow legal definition of obscenity (*Miller v. California,* 413 U.S. 15 (1973)), but instead sweeps in any words the Board subjectively labels "foul."  In practice, this vague standard has been applied only to silence critics, not supporters, of district policies.

**23.** Together, these provisions grant presiding officers standardless discretion to censor speech they dislike. They operate as content- and viewpoint-based restrictions in a designated public forum, violating the First Amendment.

**24.**  The policy provides no objective standards for determining what constitutes a "complaint," "obscene," or "foul" language. The presiding officer is left with unfettered discretion to decide, case by case, whether speech falls into one of these categories. Such standardless discretion invites arbitrary and discriminatory enforcement, which the Supreme Court has consistently condemned. *See Grayned v. City of Rockford,* 408 U.S. 104, 108–09 (1972).

25. The Board also invokes Policy GAAE, which states that it "prohibits bullying in any form, including electronic means, on or while using school property, in a school vehicle, or at a school-sponsored activity or event by any student, staff member, or parent towards a student or staff member."

26. This "bullying" prohibition is likewise unconstitutionally vague as applied to public comment. The policy provides no guidance to the presiding officer as to what constitutes "bullying" in the context of citizen speech during a public meeting. Without definitions or clear standards, criticism of school officials – even on matters of public concern – can be arbitrarily labeled "bullying" and censored. The lack of objective criteria transforms a designated public forum into a speech-free zone for dissenters, in violation of the First Amendment.

27. The "bullying" prohibition is internally inconsistent and underinclusive. It applies only when the alleged target is a student, staff member, or parent, while exempting board members and other officials. There is no explanation for this selective protection. Nor is there any rational basis for restricting criticism of school employees while permitting harsh or offensive comments directed at elected officials, who, under the First Amendment, are expected to endure robust criticism as part of democratic governance.

28. The JGECA policy on "Hazing and Bullying" further illustrates the mismatch between the district's written policies and their application to public comment. The policy defines "hazing" as:

Any act that recklessly or intentionally endangers the mental health, physical health, or safety of a student for the purpose of initiation or as a condition or

precondition of attaining membership in, or affiliation with, any district-sponsored activity or grade level attainment. This includes, but is not limited to: forced consumption of any drink, alcoholic beverage, drug, or controlled substance, forced exposure to the elements, forced prolonged exclusion from social contact, forced sleep deprivation, assignment of pranks or other activities intended to degrade or humiliate.

**29.** This definition has no conceivable application to peaceful citizen speech at a public board meeting. Nevertheless, Defendants invoke the "hazing and bullying" policies to censor and punish speakers who merely criticize district decisions or read from district-approved books. By stretching these inapplicable provisions to cover protected expression, the Board transforms rules designed for student conduct into unconstitutional tools of viewpoint discrimination.

**30.** The district further defines "bullying" by incorporating the broad statutory definition under Kansas law. According to USD 497, "bullying" includes any conduct that "recklessly or intentionally endangers the mental health, physical health, or safety of a student or employee or that substantially interferes with a student's educational benefits, with a student's or employee's opportunities or performance," occurring on district property or at district events. It encompasses taunting, teasing, or intimidation that is "so severe, persistent, or pervasive" that it creates an intimidating educational environment or substantially disrupts district operations.

**31.** The JGECA policy extends its reach to "third parties," defined to include parents, volunteers, visitors, contractors, and "others not directly subject to district control" who engage in district business or attend district events.

**32.** And when a board president or presiding officer of the meeting says "this is your warning" the speaker is not told what policy is purportedly being violated, or what

11

provision in any policy has purportedly been violated so as to inform the speaker of the actual offending speech.

**33.** The policy provides that "any student, district employee, or third party who engages in prohibited conduct as above described shall be subject to disciplinary action, which may include, but is not limited to, termination from employment, expulsion from school, or exclusion from all district property and programs and from doing business with the district."

**34.** There is no explanation why USD 497 has any significant governmental interest in applying GAAE or JGECA "bullying" policies – designed for student conduct and internal discipline – to citizens speaking at public board meetings. Both policies contain sweeping omissions and exceptions that make them ill-suited for regulating adult participation in a designated public forum.

**35.** Likewise, USD 497 has no legitimate interest in prohibiting so-called "foul language" during public comment at board meetings, particularly when (a) board members themselves are not held to the same standard, (b) supporters of district policy are not sanctioned for similar language, and (c) the very same words are freely distributed to minor students in district libraries and classrooms. Such selective application cannot be justified as a neutral rule of decorum; it is viewpoint-based censorship that violates the First Amendment.

**36.** During its regular meetings, the Board receives reports and other information from USD 497 employees, including the former superintendent Anthony Lewis and new superintendent Jeanice Swift.

**37.** School administrators regularly recognize employees by name during public portions of the Board's open meetings.

**38.** The Board sets aside time for public comment at its regular meetings, creating a designated public forum for community members to address matters of public concern.

**39.** The Board has adopted Policy BCBI, which purports to restrict what citizens may say during the public-comment period.

**40.** Policy BCBI vests the Board president with unfettered discretion to determine whether a citizen's comments violate the policy, without clear or objective standards.

**41.** The Lawrence Police Department has adopted a custom, policy, or practice of deferring to directives from USD 497 officials – including board members and Superintendent Swift – to remove individuals from public meetings based solely on alleged policy violations.

**42.** Pursuant to this practice, police officers declare a "trespass warning" against individuals on public property, even when no crime has been committed and no threat to public safety exists. If the individual does not immediately leave, officers arrest them for criminal trespass.

**43.** This policy and practice – granting board officials unchecked power to transform protected expression into grounds for trespass warnings, enforced by armed police – is unconstitutional. It converts public forums into speech-free zones, chills dissent, and violates the First Amendment rights of free speech and petition, as well as the

Fourteenth Amendment guarantees of due process and protection against vague laws.

**44.** The City of Lawrence Police Department has been reduced to little more than bouncers for the school board, excluding citizens from public property at the whim of a single board member or Superintendent Swift. These removals are not based on crimes, threats, or safety concerns, but merely on speech disfavored by officials. Such use of law enforcement to enforce arbitrary and viewpoint-based rules runs contrary to well-established First Amendment law.

**45.** The Lawrence School Board's own Policy Manual confirms that public participation at board meetings is governed by written rules. Section B, "School Board Operations," Code BCAE provides in part:

> BCAE - Public Hearings
> The board of education may hold public hearings on matters which the board deems appropriate. The board will normally hold public hearings before acting to change attendance center boundaries or holding a bond election.
> Kansas statute requires a hearing when closing school buildings.
> Public hearings will be held at a convenient time and a suitable place. The board may hold more than one (1) hearing at different times and places.
> The board will determine who shall preside at such hearings and will request every participant to state his name, residence, and purpose for speaking. The procedure governing public participation at board meetings is found in Board Policy BCBI.

**46.** Thus, Policy BCAE expressly incorporates Board Policy BCBI as the governing procedure for public participation.

**47.** Policy BCBI, in turn, acknowledges the Kansas Open Meetings Act (KOMA), K.S.A. 75-4317, and provides that:

> BCBI - Public Participation

The general public will be invited to attend all board meetings, except executive sessions. At each meeting of the board, the president or the presiding officer of the board shall welcome all visitors to the board meeting.

At each regular board meeting, the agenda may include a time for public comment. During that time, the board president or presiding officer may invite to speak those patrons who have requested in advance to participate in the public comment period. The rules for public comment shall be available from the clerk of the board prior to the board meeting and at the meeting itself. The board president or presiding officer may impose a limit on the time a visitor may have to address the board and the total time devoted to public comment at any given meeting. The board president may ask groups with the same special interest to appoint a spokesperson to deliver the group's message. Except to ask clarifying questions, board members shall not interact with speakers during public comment.

Board work sessions and board-appointed committees meet for a specific purpose or for the completion of a previously scheduled agenda. These are open meetings at which the public is welcome. Time for public comment at these meetings is at the discretion of the chairperson or at the direction of the board.

Written public comment may be submitted to the board at any time.

**48.** Despite these written policies, the Board president has explicitly communicated – both verbally and through practice – that compliments, praise, and congratulations directed at employees are welcome and encouraged during public comment, while criticism or negative commentary about staff or policies is censored. This selective enforcement underscores the viewpoint-based nature of Defendants' restrictions.

**49.** Recordings of every open meeting since January 1, 2021, are publicly available and establish a consistent pattern of enforcement.

**50.** In those recordings, the Board president has never once interrupted or sanctioned a speaker for offering praise, congratulations, or other positive comments about students or staff. By contrast, speakers who voiced criticism or quoted from district-approved library materials have been silenced, warned, or expelled. This disparate

treatment confirms that the Board's policies are applied in a viewpoint-discriminatory manner in violation of the First Amendment.

**51.** The Board president has never interrupted or sanctioned a speaker who expressed praise or positive comments about students or staff at open meetings. This one-sided enforcement – tolerating favorable speech while censoring unfavorable or critical speech – constitutes unconstitutional viewpoint discrimination under the First Amendment.

### USD497 MEETINGS, CENSORSHIP, WARNINGS, REMOVALS, AND BANISHMENTS

### JANUARY 13, 2025 MEETING

**52.** On January 13, 2025, Mr. Eravi emailed each of the board members that "I will be in attendance at the next USD 497 school board meeting. I will use language you may find objectionable. Should you decide to create a scene over it, you will create much more than simply a scene. You CANNOT limit speech of an individual. There are a few people in this community that will teach you this constitutional lessen eventually. I <u>am</u> Cohen and this is California." This reference invoked *Cohen v. California*, 403 U.S. 15 (1971), where the Supreme Court reaffirmed that offensive language – even the word "fuck" – is protected speech in a public forum.

**53.** USD 497 conducts its open meetings on an online platform called Webex. For a period of time, Webex access was open to all members of the public who requested it. Later, the district restricted participation to a narrow class of individuals – including those with a claimed "legal justification" or who had been trespassed from district property. Subsequently, the district eliminated Webex participation altogether for

certain individuals, requiring them to attend in person. Yet, individuals like Dr. Spiehs, Ms. Schmidt, and Mr. Eravi, who remain under trespass bans, are not permitted to appear in person, leaving them with no meaningful opportunity to participate at all.

**54.** Although framed as a "punishment" for banned individuals, Webex access has also functioned as a limited benefit. For example, Webex allows citizens to address the Board during inclement weather or when travel is impractical. While Webex does not provide the same opportunities as in-person participation, it remains superior to total exclusion.

**55.** Even when Webex participation was allowed, USD 497 failed to provide equal access. In multiple instances, including the Board meetings of January 27, 2025, and February 10, 2025, Webex speakers were not provided audio of the live meeting. As a result, when the presiding officer interrupted or issued a "warning," Webex participants could not hear the directive in real time. The official transcripts and recordings produced after-the-fact do not reflect what Webex speakers actually experienced, concealing the fact that these speakers were effectively censored without notice or opportunity to comply.

**56.** Although Webex participation was at times framed by the Board as a punitive measure for banned individuals, it also constituted a limited benefit. For example, Webex allowed participation when inclement weather or other practical barriers prevented personal attendance. While Webex did not offer the same opportunities as

17

in-person attendance, it remained preferable to outright exclusion and thus functioned as a partial substitute for physical access.

**57.** However, Webex access was not administered in a fair or constitutionally adequate manner. In multiple instances, including the January 27, 2025, and February 10, 2025 meetings, Webex participants were denied audio of the meeting. As a result, when the presiding officer interrupted or issued a "warning," remote speakers could not hear the directive in real time. This deprived them of any meaningful opportunity to comply. The official transcripts and recordings produced after the fact fail to capture this reality, concealing the fact that remote speakers were censored without notice.

**58.** In May 2025, the Board modified its Webex practice to provide speakers with audio of the meeting. Yet even under this revised system, participants remain entirely at the mercy of USD 497: they cannot control volume, imagery, or audio feed, and the district retains unilateral authority to mute or terminate their connection at any time, without warning or consent. This unchecked power enables arbitrary censorship and reinforces the absence of due process in USD 497's regulation of public participation.

**59.** On January 13, 2025, Dr. Justin Spiehs appeared before the Board via Webex and used his allotted speaking time to address the Board's policy on "foul language." In doing so, he posed a rhetorical challenge to the vagueness and subjectivity of the rule, stating: "When I read that I was thinking to myself isn't that some shit? I mean just think about it, who the fuck is going to define what foul language is?"

60. Presiding Board member Kelly Jones interrupted Dr. Spiehs and asked whether he could refrain from using what she described as "obscene language." Because Jones framed her statement as a request rather than an order, Dr. Spiehs continued: "Oh, fuck no. My First Amendment rights don't stop just because of that. So I think that just confirms what I was thinking, I was thinking isn't that some shit well it's actually now that I think about it it's bullshit. You can't say what words we're not allowed to speak here and come out of our mouth no matter what your ruling is for it. And so if you try to do that it just confirms even more how authoritarian you bitches are. Every single last one of you going to sit up there and try to say what words can come out of people's mouths and...

61. Unlike in-person attendees, Webex participants cannot view the meeting room timer that is projected on the board's screen. As a result, remote speakers do not receive real-time notice of when their allotted time begins or how much time remains.

62. Only after August 11, 2025, did USD 497 introduce an on-screen timer for remote speakers.

63. Even after the introduction of an on-screen timer, the precise countdown is not visible or decipherable on the publicly available meeting replays. This creates ambiguity as to whether Webex speakers were cut off prematurely and undermines the transparency and fairness of the process.

64. The Board itself exercises direct responsibility for oversight and review of the district's curriculum. Public comment on curriculum – including the content of library books and instructional materials – therefore falls squarely within the "business of

the board" and is speech on matters of undeniable public concern, entitled to the highest First Amendment protection.

**65.** Presiding Board member Kelly Jones then interrupted and stated: "Dr. Spiehs, you have 27 seconds remaining and in that 27 seconds there should not be any additional obscene language." Dr. Spiehs continued his remarks, using the phrase "complete bullshit" to criticize the vagueness of the policy. In response, Jones declared: "Dr. Spiehs you cannot use foul language when you are addressing this board" and terminated his Webex connection – silencing him before his allotted speaking time had expired. This action deprived Dr. Spiehs of his guaranteed speaking period and censored his expression solely because of the words he chose, despite their being core political speech under the First Amendment.

### JANUARY 27, 2025 MEETING

**66.** On January 27, 2025, Dr. Spiehs was recognized by Presiding Officer Kelly Jones to speak during the public-comment period. Before he could begin, Board member Anne Costello interrupted, calling him "Crazy Justin Spiehs" over her microphone, in full view of the audience and online participants. Board members have never directed such derogatory personal attacks against other citizens during public comment.

**67.** Dr. Spiehs then began reading directly from a district-approved library book, The Hate U Give, stating: "Who gives a fuck? Fuck. Seven croaks…" Unbeknownst to Dr. Spiehs, Jones banged her gavel and announced "That's your warning." Because USD 497's Webex system did not transmit meeting audio to remote participants in real time, Dr. Spiehs could not hear the warning.

68. Unaware of any warning, Dr. Spiehs continued reading verbatim passages from the book that contained the word "fuck" and then told the Board: "So this book is in your library…"

69. Again, unbeknownst to Dr. Spiehs, Jones interrupted a second time, repeated that this was his "warning," called for a recess, and muted his microphone. In reality, the Board did not recess, and the muting function operated as a unilateral silencing of his speech.

70. When his microphone was briefly unmuted, Dr. Spiehs explained that the words he had read came directly from a book in the district's school libraries, available to minors, and asked why – if minors were permitted to read those words – he was prohibited from quoting them in discussing the Board's own curriculum policies..

71. Dr. Spiehs continued reading directly from The Hate U Give, stating verbatim: "Fuck that cop, bruh. Fuck the police coming straight from the underground." Presiding Officer Jones slammed her gavel, declared that she had already "given him a warning," and terminated his speaking time. Dr. Spiehs was forcibly disconnected from the Webex platform even though his allotted time had not expired and despite the fact that he could have at least remained connected to observe the meeting.

72. Immediately afterward, the next speaker, Michael Eravi, appeared in person wearing a shirt with the word "dumb-ass" printed on it and also displayed a sign containing the phrase "fucked up." Both expressions were plainly visible to the Board and the audience. Unlike Dr. Spiehs, however, Mr. Eravi was neither silenced nor removed, despite his use of equally or more offensive language:

 

**73.** The disparate treatment of Dr. Spiehs and Mr. Eravi demonstrates that USD 497's so-called restrictions on "foul" or "obscene" language are not applied in a neutral or consistent manner. Dr. Spiehs was silenced and disconnected for quoting verbatim from district-approved library books during his allotted speaking time, while Mr. Eravi, using equally or more offensive language displayed on his clothing and signage, was permitted to continue without interruption. This selective enforcement confirms that the Board's rules are enforced based on the content and viewpoint of the speaker's message, not on any legitimate or uniformly applied standard of decorum, and therefore constitute unconstitutional viewpoint discrimination under the First Amendment.

**74.** When it came time for his speech during his 3 minute allotted time he stated:

**Eravi**: What you just did there, Miss Jones, was create a comparator. Thank you for that. I thought about reading from a book that is in the district library, and available for kids in the district to read. There are several words in the district libraries, that contain words like shit, piss, fuck and ass…
(**Jones** interrupting): Mike…
**Eravi**: …there are also a few books in our school libraries
(**Jones** interrupting): Michael this is your warning
**Eravi**: … that describe in graphic detail…

(**Jones** interrupting): I know you've…

**Eravi**: …the act of procreation

(**Jones** interrupting): …received this both virtually and

**Eravi**: …you know, most teens they call it having sex

(**Jones** interrupting): …that's it, Michael

**Eravi**: …or fucking…

**Jones**: OK! That's it!

**Eravi**: …then I thought about the inherent rights we have as United States Citizens to speak freely, and without inhibition. I'm convinced, the only was to drive this point home with assclowns…

(unknown to Mr. Eravi at this point Mr. Eravi his microphone is muted even though Mr. Eravi had speaking time remaining)

**Eravi**: …on a dais, is to simply speak fucking freely and without the bullshit inhibitions a few fools will try to force on people. Your policy is repugnant to the United States Constitution. The fact that you bitches would need to rethink your decision to put that policy in place.

(**Jones** gavels out the meeting and board members begin leaving the dais)

**Eravi**: Aside from a repugnant policy, I have little reason to appear before you. I've never had children in this district, but you've gotten my fucking money every year regardless. My challenge to you is this, if you don't like the fucking words, we're constitutionally able to vocally express in this room, either a, stop doing stupid shit, or b, don't enact policies that are clearly intended to limit the right to speak

(**Eravi** to board staff): I think you can stop the timer because they're in a recess. That's, this is hilarious the way you guys are running this

**Eravi**: There is no need for such a policy. Feelings? Fuck your feelings, Kelly. We have rights that trump your feelings, period. Beyond our simple right of expression, an institution of learning cannot properly prepare our children for real life with this unrealistic "you hurt my feelings" bullshit. I'm referring to the idea that your feelings are a priority. Damage to your feelings is not codified in law as a prosecutable crime. Some of you need to grow a pair. And Miss Jones, you need to quit acting like you have a pair, because you don't. Thank you for your time

**Eravi** (Walking away from podium area): We just proved a point in here ladies and gentlemen.

(**Jones** requests the rest of the board come back out but begins addressing issues alone)

**Eravi**: You don't have a quorum. Point of order, there's no quorum. Point of order madam chairman, there's no quorum

**Jones**: You cannot disrupt the business of this board

**Eravi**: I'm not disrupting the business of the board ma'am, there's no quorum. Ma'am, there is no meeting, you have no quorum. (turning to police) Would you tell her to stop? If you don't have a quorum, you don't have a meeting. Please understand your rules first. My god woman! You have rules too

**75.** Mr. Eravi was not required to leave the meeting or the building.

**76.** The Board's censorship of Dr. Spiehs for uttering the words "fuck" and "bullshit" mirrors the unconstitutional suppression rejected in *Cohen* at 15. In *Cohen*, the Supreme Court held that the government may not prohibit the public display of the phrase "Fuck the Draft" simply because it is offensive. The Court explained that "one man's vulgarity is another's lyric," and that the First Amendment protects not only the substantive message of political speech but also the emotive force of the words chosen to convey it. Here, as in *Cohen*, Dr. Spiehs' language was part and parcel of his political critique of district policy, and it was censored solely because officials disapproved of his choice of words.

**77.** This pattern of selective enforcement also parallels *Moms for Liberty v. Brevard County School Board,* 118 F.4th 1324 (11th Cir. 2024), where a school board silenced speakers who criticized officials or read from district-approved materials, while permitting others to speak without interruption. Just as in *Cohen* and *Moms for Liberty*, USD 497 officials here elevated their own sensibilities above constitutional guarantees, suppressing speech that was political, critical, and undeniably on matters of public concern. The Constitution does not permit school officials to sanitize public discourse at open meetings by excising disfavored words, particularly when those words are drawn verbatim from materials the district itself makes available to minors.

**78.** On January 27, 2025, Carrie Schmidt appeared via Webex to speak during the public-comment period. She began by identifying herself and explaining that she wished to address the explicit sexual content contained in books available to

adolescents in USD 497 libraries. To illustrate her point, Ms. Schmidt read directly

from A Court of Silver Flames, a book available in both district high school libraries.

The passages she quoted included:

> Good evening, my name is Carrie Schmidt and I would like to share a concern of mine regarding the sexual content you are providing in your libraries for adolescents to read. This district is providing books that describe how to eat someone out, have sex, masturbate, and give a guy head. Just so everyone understands what I am talking about I am going to read a bit of the book called A Court of Silver Flames that is available at both your High Schools.
> He couldn't take it. It was torture, a special kind of torture, to have Nesta kneeling before him with his cock in her mouth and hand and not be able to roar with pleasure. But then she stared at him through her lashes, and the sight of her with his cock between her lips snapped something. Cassian slid his other hand into her hair, and he thrust up into her mouth. She took him deep, and moaned so loudly it reverberated along his cock and straight into his balls

**79.** Presiding Officer Kelly Jones struck her gavel and interrupted Ms. Schmidt's

remarks while Ms. Schmidt continued reading, stating: "I'm just going to ask if you

can make your point."

**80.** Ms. Schmidt, confused by the interruption, asked Jones whether she was being

ordered or merely asked to stop. Jones replied: "No, I am not asking you to stop. I

want you to have your full time. I think you have a point to make and I do want to

hear it." Relying on that assurance, Ms. Schmidt continued reading verbatim from

the book.

**81.** Shortly thereafter, Jones again interrupted, striking her gavel as Ms. Schmidt

read aloud: "aching into her mouth again. He was utterly at her mercy," and

interjected: "Okay."

**82.** At this point, Board member Shannon Kimball interjected with a "point of order,"

insisting that Ms. Schmidt's comments about library content should instead be

funneled through the district's formal complaint policy. A lengthy exchange followed, in which Ms. Schmidt insisted that she was entitled to read from district-approved library books as part of her public comment, while Jones and Kimball repeatedly attempted to redirect her to the complaint process. Ms. Schmidt objected that this diversion was preventing her from making her point to the public and the Board.

83. As Ms. Schmidt said: "And I have full rights to read the content to you during public comment, because I don't think that you understand…," her Webex audio was cut off without her knowledge. Although she continued speaking and gesturing on camera, her words were no longer audible to the Board or the public. While Ms. Schmidt remained muted, Jones announced to the room that Ms. Schmidt's time had expired and disconnected her from the Webex platform.

84. During this exchange, Defendant Ronald Gordon Ross interjected, saying "I.F." to which Jones responded "it is I.F." The "I.F." they referenced is USD 497's Textbooks, Instructional Materials, and Media Centers policy. That policy requires that "any student, or parent or legal guardian of a student currently enrolled in the district, having a complaint about textbooks, media center, or other instructional materials (referred to in this policy as the 'requestor') shall meet with the teacher, media specialist, or principal. If the matter cannot be resolved, the principal shall notify the superintendent or the superintendent's designee and ask the requestor to complete a request for review form…." The process then culminates in review by the superintendent or designee.

85. Neither Ms. Schmidt, Mr. Eravi, Dr. Spiehs, nor any other member of the public could reasonably discern from this policy what constitutes a "complaint," beyond the fact that it plainly refers to negative speech about USD 497 curriculum or library materials. By contrast, the I.F. policy does not require any similar procedure for positive comments about USD 497 curriculum or materials, thereby creating a one-sided restriction that disfavors criticism but allows praise. By its own terms, the I.F. policy does not apply to individuals not listed ("student, or parent or legal guardian of a student currently enrolled in the district").

86. Jones, with the approval of Kimball and the acquiescence of other board members, wielded the I.F. policy as a pretext for censorship, interrupting Ms. Schmidt repeatedly and ultimately cutting her off before the conclusion of her allotted three minutes. By contrast, speakers who praised staff, students, or curriculum were never diverted to the I.F. process, nor were they silenced. Ms. Schmidt's remarks were germane to the Board's core responsibilities of curriculum oversight, yet she was denied three uninterrupted minutes, subjected to constant interruption, and silenced for the sole reason that her viewpoint was critical rather than laudatory. This constitutes classic and unconstitutional viewpoint discrimination under the First Amendment.

## FEBRUARY 10, 2025 MEETING

87. On February 9, 2025, at 8:17 p.m., Ms. Schmidt emailed USD 497 requesting to appear at the upcoming Board meeting via Webex, as she had been permitted to do on January 27, 2025.

**88.** In response, USD 497 imposed a newly-created restriction on Webex participation, requiring a "legal justification." The District wrote: "In addition, patrons must participate in person unless there is legal justification making it necessary to speak virtually."

**89.** Ms. Schmidt replied that she needed to speak online because of the inclement weather forecast that evening. USD 497 rejected this request, stating: "Making virtual comments is not an option. You may appear in person or email comments to the Board of Education."

**90.** Ms. Schmidt emailed again, objecting that Dr. Spiehs had been permitted to appear by Webex and that she should be entitled to equal treatment. She wrote: "If you are allowing Justin to Webex into the meeting tonight, then why are you not allowing others to do that as well? Why does he get that privilege, but I do not get that same benefit? Why did he get the link, but I did not? I would like to use the same link tonight that was sent to me last time I spoke online two weeks ago." USD 497 refused her request and did not provide her with the same Webex access granted to Dr. Spiehs.

**91.** By denying Ms. Schmidt access to Webex while extending it to Dr. Spiehs, the District arbitrarily and discriminatorily denied Ms. Schmidt the benefit of remote participation at a public meeting – a benefit particularly valuable during inclement weather – without any lawful justification.

**92.** Judge Robinson ruled in *Spiehs v. Armbrister,* No. 24-4005-JAR-BGS, 2025 WL 548423 (D. Kan. Feb. 19, 2025) that it was unclear how a meeting could be disrupted

during the allotted 3 minutes of speaking time ("Given that members of the public are entitled to three uninterrupted minutes during the public-comment period, it is not clear – based on the allegations – that such speech causes disruption or disorder when the Commission has already set aside dedicated time for the individual speakers").

**93.** Dr. Spiehs then said, "I came in here a couple weeks ago and I talked about how your guys' policy is bullshit" to which Jones interrupted him again and removed him from the meeting prior to the end of his allotted speaking time.

**94.** The podium for in person speakers was placed under TVs hanging from the ceiling which was not safe.

**95.** The dialogue is as follows:

**Dr. Justin Spiehs**: All right, my name is Dr. Justin Spiehs. At the last school board meeting one of your school board members, one of your school board members Anne Costello uh right before I started speaking during general public comment, called me crazy Justin Spiehs. Your guys' policy here at the meeting say please be respectful of the presenters the board and your fellow audience members as we discuss and deliberate the items on tonight's agenda. Comments or actions that are threatening or disrespectful of presenters the board or others in attendance, including use of foul language or any other behavior that disruptive, that is disruptive of the board meeting will result in immediate removal from the meeting. So would you guys consider that disrespectful have one of your board members call uh call me crazy? If so why wasn't she immediately removed from the meeting? Why do your guys' rules uh supposedly apply to us, but they don't apply to you guys. Furthermore, you guys have a non-discrimination statement that says Lawrence Public Schools USD 497 is committed to maintaining a learning environment free from discrimination, insult, intimidation, or harassment for any reason. Would you guys say that her calling me crazy Justin Spiehs was an insult? If it is what kind of example are you guys setting to your students? You guys' precious policies there that say we can't be a certain way, but you guys freely can. You have no consequences whatsoever for doing it. I emailed all of you asking what kind of disciplinary action be taken against her for uh for saying that about me and got no response about it at all whatsoever. So do you guys think it's insulting and disrespectful to do that if I were to call her crazy Anne Costello? Would that be insulting? What about stupid Anne Costello or ugly Anne Costello? What about bitchy Anne Costello?

(**Jones** interrupting): Justin This is your warning

**Spiehs**: …what about bitchy Kelly Jones?

(**Jones** interrupting): Your warning. Uh, it's your warning

**Spiehs**: …any problems with that?

(**Jones** interrupting): Can you pause the. Justin you're, I'm pausing your time. If you continue with any foul language you will be stopped from participating because it's disruptive. It doesn't comply with the policy. Can we start the time back please?

**Spiehs**: And so now I'm able to also use foul language now? Is that uh is that what's going on here? Why, why is that allowed now? I mean I, I came in here a couple weeks ago and I talked about how your guys' policy is bull shit and this, this-

(**Jones** interrupting): Okay you can disconnect. You can turn off the…

**Spiehs**: … perfectly demonstrates how much bullshit it is

**Jones**: Got it? Okay thank you. Okay we're going to move on to the next speaker. Um Michael you can come to the board. Just to be clear make sure you stay at the podium.

**Eravi**: You got a safety hazard there that I'm not going to comply with. I'm not standing

**Jones**: If you come up to this board

**Eravi**: I'm not standing underneath that thing. Cuz if it falls it's…

**Jones**: If you move from that spot I'm going to ask for you to be leave. To have to be removed

**Eravi**: Shut up

**Jones**: That's where we're at

**Eravi**: Crazy Anne Costello why don't you chime in here? Don't start giving me directives lady. The only reason you're acting that way is cuz of who I am. The way you're acting is bullshit.

**Jones**: So that's your warning.

**Eravi**: You, you just threw somebody out…

(**Jones**: interrupting) That's your warning

**Eravi**: …because they used a curse word. You guys need to grow some, grow some thicker skin, because if curse words hurt your feelings that's pathetic cuz in your, in your library you've got books that describe in graphic detail the act of procreation. Did you know that? Shake your head yes I knew that. Right Kelly, right Kelly Jones your hatred for me just bleeds through, because if I can't move from right here. What if I stood right here? Is that a problem for you? What if I stood over here, is this a problem?

**Jones**: Michael that is where we're doing public comment at…

**Eravi**: How about if I came right here….

**Jones**: Okay so at this point you're being disruptive

**Eravi**: How am I being disruptive? I'm during, I'm during…

**Jones**: Because you need to stay where I have a, can you pause the time?

**Eravi**: "You keep interrupting me."

**Jones**: "I am being clearly, I have paused the time. Where you can speak is at the podium. If you move from the podium you will be sitting. "

**Eravi**: I'm not standing underneath that thing
**Jones**: Are we clear?
**Eravi**: No Kelly we're not clear, because you're being real bitchy toward me.
**Jones**: Okay that's it, you need to sit down
**Eravi**: No I'm not going to sit down.
**Jones**: If you don't need, if you need help sitting down.
**Eravi**: Start that timer back up because I have 3 minutes and you're not going to have anybody help me sit down
**Jones**: Oh yes I will
**Eravi**: Start that timer back up. I have 3 minutes
**Jones** (to the police officers in the room): Can I, can you please assist him in sitting down please?
**Eravi**: Start the timer back up I have 3 minutes. Start the timer back up I have 3 minutes. Start the timer back up please I have 3 minutes. You stopped the time at 2:07….
(**Jones** talking over Eravi): Are you going to, are you going to comply with the policy?
**Eravi**: ….Please start the timer back up. You stopped at 2:07. I have 3 minutes. Start that timer back up please. Start that timer back up. I have 3 minutes
(**Jones** talking over Eravi): Michael you have to comply with the policy and you did not.
**Eravi**: …you have to comply with the US Constitution. Start that timer back up. I have 3 minutes. Start that timer back up.
**Jones**: You are being disruptive in the meeting. You need to sit down.
**Eravi**: Start that timer back up. The charge is 215922 if you think you can stick it go at it. You got…
**Jones**: You need to sit down
**Eravi**: You stopped the time. I need the timer to start, so I can finish my 3 minutes.
**Jones**: Are you going to finish it within the Policy?
**Eravi**: I need the timer to start, so I can finish my 3 minutes
**Jones**: Can you go to the podium?
**Eravi**: I need the timer to start, so I can finish my 3 minutes
**Jones**: Oh my God
**Eravi**: It's that easy. Start the timer so I can finish my 3 minutes please. It's that easy. Start the timer, so I can finish my 3 minutes. Start the timer please. Start the timer. When the timer starts. Start the timer Kelly. We're at a standstill here. Your timer is at 2:07. Start the timer so I can finish
**Jones**: Can you sit down please?
**Eravi**: Start the timer so I can finish my 3 minutes. You've interrupted my 3 minutes and stopped me at 2:07. Please let me finish my 3 minutes
**Jones**: Can you sit down please?
**Eravi**: Let me finish my 3 minutes. Start the timer back up and let me finish my 3 minutes. You're violating the law right now. Start the timer back up and let me finish my 3 minutes

31

**Jones**: Please sit down

**Eravi**: Kelly, you're violating the law right now. Start the timer back up

(Jones talking over Eravi): Then take it up with your legal counsel. You need to sit down

**Eravi**: Please, let me finish my three minutes

**Jones** (to police in the room): Can we get help please? Removing him from the, the building or sitting down? Just sitting down is fine

**Jones**: (to Eravi): You may stay and you can, we want to hear what you have to say and you can come back

**Eravi**: I want my 3 minutes. Start the timer…

**Jones**: Are you going to comply with the policy if I turn this back on?

**Eravi**: So I can finish my 3 minutes. There's no questions to answer. Start my timer back up so I can finish my 3 minutes. Start my timer back up

(**Jones**: *Big Sigh*)

**Eravi**: They're not going to arrest me because they know I've not broken a law. Start the timer back up

**Jones**: You are disrupting this meeting

**Eravi**: No I'm not Kelly. You disrupted it by stopping my time…

(**Jones** talking over Eravi): I stopped it so that you could have your full 3 minutes. If you comply with the policy

**Eravi**: … tart my timer back up your policies are unconstitutional. Start my timer back up, so I can finish my three minutes

**Shannon Kimball**: Madam president, could I call, could I ask if you would like to call for a recess?

**Eravi**: I will expect my 2 minutes and 0 7 seconds back when you get back. I'm not leaving until I get my full 3 minutes Kelly Jones. And they're not going to arrest me because I haven't broken a law. You gave me 3 minutes and you took it away.

**Jones**: I'm not asking anybody to arrest you I'm asking you to sit down

**Eravi**: They're not going to do anything to me because I haven't broken a law Kelly. You need to start my timer back up and let me finish my three minutes. That's your only choice here. That's your only choice. I'm sorry that you don't like it, but that's your only choice. Start the timer back up, please. You're making this harder than it needs to be. Start that timer back up guys please

**Jones**: You know what…?

**Eravi**: 2 minutes and 7 seconds and I'd be done. 2 minutes and 7 seconds. Start my timer please. We've already taken way too much time Kelly start my time back. Please. (Long pause) Start my timer please

**Jones**: Go ahead, start the timer

**Eravi**: My challenge to you is this, if you don't like the fucking words…

(**Jones** interrupting): Okay that's it. You got to go

**Eravi**: *inaudible*

**Jones**: Stop. We're going to call recess now please

**Eravi**: Start my timer back up…

**Jones**: You need to be sitting down when you come back. Your time is done

**Eravi**: My time is not done. I will have 2 minutes and 2 seconds when you come back

(Board went into recess for approximately 2 minutes. Michael Eravi is still standing waiting to speak).

(Board resumes with meeting)

**Jones**: And the time for public comment has ended

**Eravi**: I have two minutes and 2 seconds left *inaudible*…

(**Jones** interrupting): We're moving on now

**Eravi**: …speak

**Jones**: Do we have another speaker?

**Eravi**: Point of order. Point of order. You can't do this, you can't Constitutionally do this. You can't just shut us down like this

**Jones**: In person?

**Defendant Swift**: I think so

**Eravi**: You can't do this

**Jones**: Oh okay. Okay. Is Carrie Schmidt here? In person?

**Eravi**: I have 2 minutes and 2 seconds left. Can't kick me out. Public comment is not over and I have 2 minutes and 2 seconds left. You tried everything Kelly. Just give me the 2 minutes and 2 seconds and we're done. You tried every illegal move here Kelly. Give me 2 minutes and 2 seconds back on the clock and lets finish.

**Jones**: Okay we're moving, uh. I need a consultation about whether or not I can remove public comment. I'm going to cause a, call a recess to make sure that I'm…

**Eravi**: Call your attorney, you're gonna get sued over this one. I want my 2 minutes and 2 seconds back

**Kimball**: Madam president would you like to call an additional recess?

**Jones**: Yeah we have to call an additional recess

**Kimball**: Okay

(as board members walk out)

**Eravi**: Just give me 2 minutes and 2 seconds guys this is absolutely childish and pathetic. Go join em crazy Anne Costello. Go join em.

(Board went into recess for around 6 minutes.  Mr. Eravi speaks while board members absent)

**Eravi**: This is stupid. This is dumb. Look at the example you are setting for the students here. Trying to shut one person down, you're going to go through this amount of crap. Pathetic. Pathetic, every one of you. You should be ashamed of yourselves and this board, the way they're acting tonight.

(turning to police) and I do appreciate you two understanding the law finally, and not moving to just arrest people because they say so.

(turning back to the board) Maybe you guys should take a lead from LPD, they're figuring it out. Maybe you guys could too. If they thought you could do this, they would have already been up here doing it. Think about that. Then make a motion to just have your chair give me my 2 minutes and 2 seconds. And as a result of the way this meeting has gone, I'll be back again in a couple weeks. Until you guys can get it right, I'm going to be here every time. 2 minutes and 2 seconds. That's all you

33

need to do. 2 minutes and 2 seconds. (Long Pause) You think you guys can tell people where they can stand, where they're allowed to talk? And the nastiness! There's no need for it. Before I even had a chance to speak. 2 minutes and 2 seconds, it's worth it, that much. To me it is.

**Eravi**: (Holding up his paper): How come I don't get thrown out for this? Guys, Really? How come she doesn't try to shut me down for this, I've been holding this all night long. Why is that? (turning to journalists) Newspaper? Why is that? I've been holding this all night long, but she hasn't tried to throw me out. The written word is ok but the vocal word isn't. It's called a constitutional comparator people, and it's a problem.

**Eravi**: Man! Do you know how bad she's caught trying to end public comment like that? Whew, Dam, That's gotta sting. Two minutes and two seconds. That's all I want.

**Eravi**: Spending all this time trying to figure out how to make me go away, and the only way you're gonna do it is by giving me my 2 minutes and 2 seconds. That's the only legal way it's gonna happen. Look at the amount of time you're taking trying to figure out how to make me go away. Does that make any sense to you guys? (Turning to staff) Staff? Does this make any sense to you guys at all? The amount of time you're putting toward making one guy go away?

**Eravi**: At the point you guys can get them to threaten my arrest, I'll leave. If you can get them to threaten my arrest, I'll leave. If you can get one of those officers back there to tell me if I don't leave, I will be arrested, that's the point that I will leave. Otherwise, I'm getting my 2 minutes and 2 seconds. So if you can get one of them to put themselves on the line instead of you, that's your only way out. Cause that's what they'd be doing, is putting themselves on the line for you, because you guys screwed this up and they both know it.

(Board members re-enter the room)

**Eravi**: 2 minutes and 2 seconds Ms. Jones. Putt 'em back up and let's get this over with. It's the only legal way you're getting out of this.

**Jones**: I apologize for taking so much time

**Unknown Male Voice**: Want to be there

**Jones**: I believe we have

**Kimball**: Yes, Madam President given that uh we have other agenda items to attend to this evening uh that we need to get our business done I make a motion that we amend our agenda and we move the public comment item to the end of our agenda for this evening and uh continue our public comment…

**Eravi**: Unacceptable

**Kimball**: um after we have completed item

**Eravi**: Point of order you can't move it, it's already….

(**Jones** talking over Eravi): You cannot make a point of order

**Eravi**: You've already started public comment

**Jones** (to another board member): Go

**Eravi**: You can't stop public comment in the middle of it guys

**Kimball**: I can

34

**Eravi**: I have 2 minutes 2 seconds
**Jones**: So we have a motion
**Board Clerk**: The motion passes 7-0

**Jones**: Okay
**Yolanda Franklin**: I didn't say yes. I was going to say no
**Eravi**: Ms. Franklin. Thank you for supporting the constitution
**Board Clerk**: Oh, I'm sorry. The motion passes 6-0
**Kimball**: No, 6-1
**Eravi**: The rest of you are going to get named in a lawsuit for this
**Jones**: Kay
**Eravi**: You cannot shut down public comment at 2 minutes and 2 seconds remaining...
(**Jones** talking over Eravi): Okay we are going to move on to board commentary. You need to sit down
(**Eravi** to Sgt. Eric Barkley): Is this what you guys are going to allow? Is this what you guys are going *inaudible*?
**Jones**: Wait, this is disrupting the meeting
(**Jones** to Barkley): Can we please get assistance so that we can continue with the business of the board?
(**Eravi** to Barkley): Am I disrupting the meeting or did they disrupt public comment? It's for you to decide. Cus they're asking you to threaten my arrest at this point now. They have violated the law
**Barkley**: The only, the only way you'd be removed, for him to be removed, at this point, is if Dr. Swift would ask you like criminally trespass you from the building
(Eravi to Barkley): And how do I get criminally trespassed when I've broken no law sir?
**Barkley**: I'm just saying that, that's the only way like at this point
(**Eravi** to Barkley): And how's that going to happen if I've broken no law?
(**Jones** to Barkley): So if we, if he, if we continue to, just, if he stands up here and continues to make, I just want to be really clear...
**Eravi**: 2 minutes and 2 seconds
**Jones**: ... that if he stands up here and continues to just disrupt and we cannot continue with the business of the board he may continue to do so, is that correct?
**Eravi**: How can I be disruptive during my time to speak?
**Barkley**: I guess my point is you you've been given an opportunity to speak for 2 minutes and 9 seconds by whatever making rude comments he's not breaking any law
**Kimball**: But he is breaking our decorum rules and the chair has the authority within the board meeting to enforce decorum rules and she is trying to do so and...
**Eravi**: ...not discriminatorily
**Kimball**: ... we are trying to figure out a solution to this where we can continue our board meeting while also respecting people's rights to have public participation
**Eravi**: two minutes

**Kimball**: He has now taken up an extreme amount of time in this board meeting fighting with the chair

**Eravi**: Her, no

**Kimball**: over our decorum rules, which she is allowed to enforce. So we, we really have a problem here and I am asking…

**Eravi**: point of order. You can't reframe this. You can't reframe this

**(Kimball** raising voice): "I have the floor as a board member. You can sit down and be quiet so that we can…

**Eravi**: You can't reframe this that I have interrupted during my time guys

**(Kimball** raising voice): Because you are not following the decorum rules.

**Eravi**: Guys, I have two minutes and two seconds

**Kimball**: We have them and we are allowed to enforce them

**Eravi**: You can't just arbitrarily shut it down and shut me down that way. It's illegal. I'm gonna sue you

**(Kimball** in raised voice): You, you are permitted to speak if you follow the decorum rules and you have repeatedly decline to do that

**Eravi**: I want my 2 minutes and 2 seconds back up on the screen. two minutes and two seconds

**Jones**: Without any assistance I would like to. I'm going to have a conversation with the board colleagues, and you can listen Michael okay just for a moment. We do not have assistance from law enforcement. Michael is not going to sit down. I do want the board meeting to move on. I think Yolanda likely would to based on vote. Um so I'd like the board to reconsider the, uh motion to move to the end, the comment to the end of the meeting, um and we will need to consider uh utilizing public comment in future meetings, which likely, unlikely at this point. Um, so I'm asking, I we have no assistance to uh get him to sit down or to otherwise move so I'm asking the board to reconsider the motion that was on the table just to get this to move along

**Gordan Ross**: I'm fine with letting him speak

**Bob Byers**: If, if, uh his, okay. If we move it to the end of the meeting, he, he has his 2 an, 2 and a half minutes or, to speak

**Jones**: We have no assistance in enforcing our policy. We have, we have been informed that we have no assistance enforcing the policy and that he will not be sitting down. He's informed us that he's going to continue…

**Byers**: So?

**Jones**: …to remain in the building. So if he will sit down after 2 minutes that might be the best thing that we can…

**Byers**: I'm in, I'm inclined as GR is just let him speak. Let him speak

**Costello**: Do you need a motion?

**Jones**: Yes

**Byers**: We would need a motion

**Costello**: I move to reopen public comment um and move it back from the end of the meeting to current. I don't know if there's anything else

**Kimball**: Or just say move it to its current

**Costello**: Move it to its current place in the agenda

**Gordan Ross**: Second

[motion passes 6-1 with Kimball voting no]

(**Jones** to Eravi): I'm gonna give you back your time on the on the clock. I do not have to listen to you. I'm going to get up and leave, and then when you are done I'm going to come back out

(Jones walks out)

**Eravi**: Start my time that's a whiny bitch move right there

(Kimball walks out)

**Eravi**: Now you guys all learned this fucking lesson. Stop shutting people down. Give them their goddamn three minutes and shut your fucking mouths. They're allowed to come in here and talk. Trying to put somebody underneath a hazard like this is stupid. This podium should be either up here or off to the side or in the back. Trying to make somebody stand underneath that is a risk and I'm not going to take it for you dumb asses and the fact that she verbally came at me before I had even a chance to speak laid your intent there. And that one, Kimball who voted no. How insane is that? You guys just got taught a lesson. And do you hear how I don't need to cuss now because you got taught the lesson? You got taught to shut up and just let the people speak. Next time Justin Spiehs is on your damn Webex just let him speak. When she comes up here to talk just let her fucking speak. How hard is that? Really. Gordon why do you hate me so much? Is it because I asked you about the policy and you kind of threw the board under the bus? I want to see that policy that said we can't speak online anymore, because I assure you, you're going to long for the days that you could have relegated me to the online room. You can have your thirty seconds back

(**Eravi** to Police Officers): I appreciate you guys following the law. Thank you.

**Jones**: Okay the last public comment is Carrie Schmidt

**Schmidt**: Is it safe to stand under here? Now I'm worried. Cus…

**Jones**: *inaudible* go ahead.

**Schmidt**: It's kind of like your liability. Okay. Wowza, can y'all hear me?

**Jones**: Can you restart it? She was getting settled

**Schmidt** (moving the podium back so it's not under the TVs): I'm just…

(**Jones** interrupting): "to three *inaudible* clock

(**Schmidt** moving the podium back.): trying to…

**Jones**: No it's okay. We want to get you back to the three minutes here

(**Schmidt** moving the microphone to be by the podium.): *inaudible* out what's going on here

**Jones**: Okay, as soon as you're settled we'll start the clock. Welcome

**Schmidt**: I don't know if I'll ever be settled

**Female Board member**: Yeah me neither

**Male Voice**: "*inaudible*"

**Schmidt**: Can we scoot this back?

**Jones**: Just if you could…

37

(Schmidt moves podium further away from beneath TVs): I'll be further away from you. That okay?

**Jones**: Not really but, just…

**Schmidt**: Okay, um, with all due respect I have to say that I'm appalled with how you all are treating certain people who speak at these meetings. Just because they aren't praising you doesn't mean that you get to decide what words they are allowed to say in here, interrupt them or turn off their mics, so no one can hear what they have to say. You caused this by the insane policy you set. You told me last meeting that I would get my time back after you rudely interrupted me while I was reading a book available to your high schoolers in the district, then you spoke during my time, told me that I did not have the right to speak and then my time was magically over. I'm speaking to show you how wrong you eh, how wrong you are and hypocritical your policy is, because although you preach decorum here you provide porn and vulgarity to the students in this district. With that I'm going to share with you just some book titles in the district that I think that you should know about. Um, here we go. Here Lies a Vengeful Bitch in a high school. Cock-A-Doodle Dudley elementary schools. You stopped me last time for saying that word. Yaki Delgado Wants to Kick your Ass, middle and high schools. Wonderful Pussy Willows in an elementary school. Lady, My Life as a Bitch in a high school. The Transformations of Lucious, Otherwise Known as a Golden Ass in a high school. Words Will Break Cement: The Passion of Pussy Riot in a high school. My Hero Academia Volume 2 Rage You Damned Nerd in Middle Schools. Moby Dick or The Whale middle and high schools. You'll Love Cock-a-Poos in an elementary school and The Owl and the Pussycat in an elementary school. Uh, this one is good the title is Did Nobody Give a Shit What Happened to Carlata

I picked up the book and opened it to a random page and it said this That's why men who don't be fucking men be fucking the fuck out of men, up in their right, because human contact just human contact at the end of the day, something warm with the hole right there and you'll reach out and touch it. Cuz you know that's quality right here. It is interesting to me that you allow any and all words to be read by adolescents, but you pick and choose what words adults are able to say in these meetings and call me crazy, but that seems to go against our rights as damn Americans. Maybe you'll be okay with the book that's in elementary, this book that's in elementary and middle school is called The Body Book for Boys. Um, let's see what it has to say

You come across an ad in a magazine or on the web for some magical product that will make your penis bigger. It might be a cream, a pill or even something called a penis pump. Don't be fooled there's no way to change the size of your penis. Why is your District teaching Elementary and Middle School age students about sex toys? Shame on you.

**Jones**: Okay your time's up.

**Kimball**: "Madame President I did want to give an explanation of vote, for my vote earlier so I'll use my public comment time for that purpose. I was in a Committee

hearing today, in the Kansas State House or I observed a Committee hearing today in the Kansas State House. and you can check the video on this, where a person giving testimony, didn't even use curse words they actually just said some unkind things. and the chair called for the person to end their time and sit down early. and no one questions decorum rules when they are enforced, in the State House and, and in other places and for some reason in this community, we seem to have, lost the ability to enforce reasonable decorum rules in a public meetings to protect the integrity of the people who serve, the people who work in these spaces, and the people who observe these meetings, including our teachers and our students and our parents and I think that there needs to be some really deep soul searching um, as to why that kind of behavior is okay in these spaces, but not in other spaces and that is why I voted no, because I think that um you know bullies are going to continue to bully when they're permitted to be bullies and we are attempting to um enforce our anti-bullying policies our anti-hazing policies, our complaint policies. That's why we have all of these rules and we absolutely must be permitted to enforce them…

***

**Jones**: "mm, hm. I appreciate the insight. I really appreciate both you and Shannon's comments pertaining to that. I do um there is one other opportunity for us to consider or well for me to consider and that is that um it might be that public comment has become too disruptive and we might need to unfortunately um open up uh contact with the board through um email and um individual meetings as needed um in order to get control back of the meeting. So it is pretty heartbreaking to me to be considering that at this point, but um we do not have assistance from, um based on what was described to us during the meeting from, uh, that we're not able to get assistance in terms of just getting control of the meeting from, um, in the manner that I had anticipated, so we will need to consider that for the next um short bit of time unfortunately. Uh because it is disrupting um our work at this point. So

**96.** These shifting and selectively enforced restrictions on Webex access, combined with presiding officers' inconsistent and subjective censorship of speech, amount to a prior restraint on speech and a content-based restriction in a designated public forum. By granting Webex access to some critics (such as Dr. Spiehs) while denying it to others (such as Ms. Schmidt), and by muting or interrupting speakers based on the perceived offensiveness of their words rather than any genuine disruption, USD 497

has engaged in arbitrary and viewpoint-based discrimination in violation of the First and Fourteenth Amendments.

**97.** Prior to February 24, 2025, the Board decided (without voting at a quorum official meeting) to move public comments to the end of their open meetings.

### FEBRUARY 24, 2025 MEETING

**98.** Prior to February 24, 2025, the Board decided (without voting at a quorum official meeting) to move public comments to the end of their open meetings.

**99.** On February 24, 2025, Ms. Schmidt read to the Board during her allotted speaking time from the same book Dr. Spiehs read from (The Hate You Give) including verbatim passages including "Fuck the police" in which Ms. Schmidt was not interrupted or removed from the meeting.

**100.** Immediately following Dr. Spiehs then spoke during his time via Webex stating Judge Robinson's ruling about not being a disruption during one's allotted speaking time and then concluded "so the disruption is coming from you assholes." Presiding board member Jones interrupted Dr. Spiehs and warned him. Dr. Spiehs said "Fuck you and your warning" which the defendant Jones disconnected Dr. Spiehs from the meeting prior to the conclusion of his allotted speaking time.

**101.** The contrast between Ms. Schmidt's uninterrupted reading of "fuck the police" directly from a district library book and Dr. Spiehs' immediate silencing for using the phrase "you assholes" demonstrates that USD 497 does not apply its so-called "decorum" rules in a neutral manner. Instead, the Board tolerates the same language when presented in support of its preferred narrative (e.g., read from approved


curriculum), but censors and punishes the identical language when deployed critically against Board members themselves.

**102.** This selective enforcement reveals that USD 497's speech rules are not content-neutral regulations designed to preserve order, but viewpoint-based restrictions targeting critics of the Board. Under *Cohen*, the government cannot censor protected speech merely because it is offensive to officials or listeners. Nor can it grant some speakers leeway while silencing others, as the Eleventh Circuit confirmed in *Moms for Liberty v. Brevard Pub. Sch.,* 118 F.4th 1324, 1331 (11th Cir. 2024). USD 497's censorship of Dr. Spiehs is thus unconstitutional.

**103.** Immediately following, Mr. Eravi appeared via Webex. He began by reminding the Board that he had previously emailed members to warn that he would use language they might find objectionable in order to highlight their unconstitutional censorship practices. He specifically cited *Cohen v. California* and the First Amendment's protection of offensive or profane speech in a designated public forum. Mr. Eravi stated:

> It is a constitutional right of the people to express those points of view in this public forum… I referenced Cohen v. California, a Supreme Court case that specifically addressed cursed words and obscene language, and the right of the people to use those words and phrases you find objectionable. Instead of recognizing the clear legal implications of your actions, you chose to criminalize me… What this means for the dipshits on the dais…

**104.** At this point, presiding officer Jones interrupted and issued a "warning." Mr. Eravi continued: "…this means you are to sit there on your ass and keep your fucking mouth shut for three minutes."

**105.** Jones then cut off Mr. Eravi's microphone and, with the assent of other Board members, disconnected him from the Webex feed before his three-minute speaking time had expired.

## MARCH 10, 2025 MEETING

**106.** On March 10, 2025, Ms. Schmidt addressed the Board in person during the public comment period.

**107.** At a prior meeting, Board President Kelly Jones had highlighted Ms. Schmidt's non-residency by stating, before Schmidt spoke: "Carrie I think you're joining us, I don't have your information here, but you're joining us from outside of Lawrence correct? Outside of Douglas County?" Then, after Schmidt finished speaking, Jones added: "Thank you for coming up to Lawrence, appreciate you driving." In reference to this disparaging singling out, Ms. Schmidt began her March 10 remarks by saying: "Hello, my name is Carrie and I am that bitch from some other fucking town."

**108.** Defendant Jones immediately declared that Ms. Schmidt had violated the public comment policy.

**109.** Ms. Schmidt replied: "I started coming to these meetings because of the hypocrisy in your shitty profanity policy."

**110.** Jones then stated: "Okay that's it, you need to now leave… if you are not going to be cooperating we will ask that you be removed from the building." Jones directed that Schmidt's microphone be muted so her remarks could no longer be broadcast or heard by the public.

**111.** Vice President Ronald Gordon Ross responded: "Do it." Jones then conferred with Lawrence City police officers stationed in the meeting room. At that point, City staff physically redirected the camera feed away from Schmidt, ensuring that her removal could not be viewed by the public.

**112.** Lawrence police officers Affalter and Bishop then confronted Ms. Schmidt while she was still within her allotted speaking time, ordering her to stop speaking and leave the building – not because she posed any threat or disruption, but solely because of the words she chose to use in criticizing the Board's policies.

**113.** Ms. Schmidt was forced by Lawrence police officers to leave not only the meeting room but the entire public building, despite being within her allotted speaking time.

**114.** During the same March 10, 2025 meeting, Dr. Spiehs appeared online by Webex during the public comment period. He began by stating: "You know what they say, the thing about smart motherfuckers…"

**115.** Defendant Jones immediately interrupted, declaring: "That's your warning Justin." Dr. Spiehs continued: "…is they look like crazy motherfuckers to stupid motherfuckers."

**116.** Defendant Jones then stated: "You can turn it off, he's had plenty of warnings." Dr. Spiehs' Webex connection was terminated before his allotted time expired.

**117.** Mr. Eravi next addressed the Board via Webex during his scheduled time. The exchange was as follows:

**118.** Mr. Eravi spoke online via Webex next during his allotted time. The dialogue was as follows:

43

**Jones**: Michael

**Eravi**: hello?

**Jones**: hello Michael

**Eravi**: I find it interesting that you're still cutting off people for words they say, and, you know, that was a quote from albert einstein. I've noticed in the last couple meetings you've got a lot of inconsistencies happening. some people can say certain things and still come to the meetings, and some people can't. some people can say things if it's a quote, some can't. it's, it's pretty interesting the way all this is working out. I do want to touch on one thing before we get too far, because that educational thing that you guys talked about where you're adjusting for your snow days. you know, I'm sure the parents appreciate you taking care of the kids for a few extra hours over the course of the school year, but how much educational time do you think is happening in the last 15 minutes, or the last 30 minutes of the day, that's just been arbitrarily added to a few days at the end of the year. um, i can tell you as a former student, though it's been a while, that that little time at the end of the school day is nothing, and there's no educational value to it. so, it's another example of how you guys are just checking boxes. you're not actually looking after the kids' interests, and the kids' educational interests. in the ways that you censor people, you're not educating the children about the way this country was founded, and the way this country has operated for what, 250 years? and uh, Kelly jones has taken it upon herself to just change what our rights are, and to decide what our rights are. that quote that Justin was saying, was by albert einstein. and quoting Albert Einstein, he did say, the thing about smart motherfuckers

**Jones**: This is your warning

**Eravi**: Kelly, I'm doing nothing but quoting somebody

**Jones**: This is your warning, so just keep on keepin on

**Eravi**: How are you giving me a warning for quoting somebody? and now that you've got me online, you're just gonna shut me down as soon as I finish the quote, aren't ya. is that right Kelly? you know, one of the commenters in a video I put up said you need to get a new flobee. cause it ain't working for you. your hairdo needs some work. I'm gonna finish the quote Kelly, because you not gonna silence me. that's what your whole goal has been. as albert einstein said, the thing about smart motherfuckers is …

**(Jones** interrupting): can you shut the thing…

**Eravi**: …they look like crazy motherfuckers to stupid motherfuckers

**Jones**: thank you, ok…

119. Mr. Eravi was then disconnected from the Webex meeting before he could complete his remarks, once again silenced solely for quoting constitutionally protected language.

120.   The incidents of March 10, 2025 – where Ms. Schmidt was forcibly removed by police, Dr. Spiehs was cut off mid-sentence and disconnected online, and Mr. Eravi was likewise silenced and disconnected – reveal a consistent and unconstitutional pattern: the Board selectively censors speakers based on disfavored viewpoints and the use of certain words, even when those words are directly relevant to the subject matter or quoted from published works. Rather than apply neutral rules of decorum, the Board has weaponized its policies to suppress criticism and punish dissent. This pattern of arbitrary enforcement constitutes classic viewpoint discrimination, in direct violation of the First and Fourteenth Amendments.

121.   The events described above are not isolated or accidental. Rather, they reflect a deliberate and ongoing pattern of censorship, retaliation, and exclusion by USD 497's Board of Education and Superintendent Swift. Over multiple meetings spanning months, the Board has consistently silenced speakers for disfavored viewpoints, disconnected remote participants mid-speech, and summoned armed police officers to enforce its unconstitutional "speech code."

122. This pattern is reinforced by the Board's repeated failure to adopt any clear, written, and lawfully approved rules of public comment in compliance with Kansas Open Meetings Act requirements. Instead, the Board has allowed presiding officers to exercise unbridled discretion to determine what constitutes "obscene," "foul," or "bullying" speech – terms undefined in Board policy. This vagueness enables arbitrary enforcement and invites viewpoint discrimination, which the Board has in fact practiced.

**123.** By repeatedly enforcing these unconstitutional restrictions and involving law enforcement officers to carry out removals and trespass orders, USD 497 has established an official custom, policy, and practice within the meaning of *Monell v. Department of Social Services,* 436 U.S. 658 (1978). The violations of Plaintiff's rights are not the result of rogue actors or misunderstandings, but of a deliberate and institutionalized scheme to suppress dissenting voices and chill protected expression at public meetings.

### MARCH 24, 2025 MEETING

**124.** On March 24, 2025, Dr. Spiehs again appeared by Webex during his allotted speaking time. He began by noting that he had not received an apology for board member Anne Costello's prior public insult, calling him "Crazy Justin Spiehs." To illustrate the absurdity and arbitrariness of the Board's profanity policy, Dr. Spiehs carefully spelled out the letters comprising the word "fuck," then pronounced them as "fah que." Presiding officer Jones immediately interrupted him with a warning.

**125.** Dr. Spiehs then shifted to reading directly from The Hate You Give, a USD 497 library book, quoting the phrase "Fuck the police. Fuck the police." On this occasion, Jones did not initially interrupt or issue a warning. But when Dr. Spiehs added that the same phrase also appears in the song "Fuck tha Police" by N.W.A., Jones abruptly declared it his "last warning" and disconnected him from Webex before the expiration of his allotted three minutes.

**126.** That same evening, Mr. Eravi – who remained banned from school property – spoke via Webex. Jones permitted him to spell out "fuck" without interruption, as

46

well as to say words such as "ass," "damn," "frigate," and "frack." But when Eravi said

the word "fucking" or the phrase "fucking shit," Jones immediately warned him and

ultimately muted his microphone.

**127.** The dialogue was as follows:

**Michael Eravi:** So, I'm a little confused here. In what context am I allowed to say the word f-u-c-k? I'm asking a question. Pause the time. I need some clarification here. Pause the time. You guys need to clarify this. Not going to pause the time? You're not going to clarify anything Kelly? You're just going to lash out at people? Is that really what's going on here Kelly? You're just going to lash out at people like a fucking dictator?

**Jones**: Ok, that's your warning

**Eravi**: That's my warning? I'm sorry Kelly, did I hurt your feelings honey? Is that just a little more than you can handle? Is freedom of speech too much for you sweetie pie? No, I, I'm really serious here Hun… are you just so sensitive that you can't handle that? You're an elected official woman. I don't know who the hell you think you are, but you're acting like a damned tyrant. So, what words are acceptable? "Ass" is in the bible, am I allowed to say "ass"? Ass must be okay, I got it. How about "damn"? I can say "damn", ok. How about "frigate". Got it, I can say that one. How about "frack"? Got it. Frack is good. Frack you Kelly. Do you know what that fracking means? Since I can say "frack", we'll just use that one. Since that one's the one that's going to work here. These policies are absurd lady. And the way you're enforcing them, you're going to get yourself sued again. And while we're on the topic of being sued, and your attorney being in there tonight. I'm pretty disappointed in Brad Finkeldei. Cause it's pretty obvious he brought this little 60-day idea to you dumbasses. You're going to restrict people out for the words that they say, and silence them for the words that they say. You've done it tonight, and you continue to do it. I'm going to be back in that room Kelly, and I'm going to say more than "frack you". Do you understand that? I'm going to be back in that room, and I'm going to say a lot more than "frack you, you fracking idiot". You got it? This shit is fucking absurd,

**Jones**: Ok, that's it.

**Eravi**: disconnect the call.

**Jones**: Please turn it off.

**128.** These incidents demonstrate the arbitrary and viewpoint-based enforcement of

USD 497's speech rules. The very same word – "fuck" – was tolerated when spelled

out, tolerated when quoted from district-approved books, but punished when used to

criticize the Board or its policies. Such selective treatment cannot be explained by any legitimate governmental interest. Instead, it reveals that the Board's true concern is not with the word itself, but with who says it, how it is said, and what viewpoint it conveys. This discretionary censorship is the essence of unconstitutional viewpoint discrimination and vagueness under the First and Fourteenth Amendments.

**129.** Defendant Swift's March 24, 2025 trespass notice demonstrates USD 497's unconstitutional delegation of unchecked power to a single administrator to determine, on her own discretion, who may access public property. The letter admits that Swift could either grant or deny Ms. Schmidt access depending on her personal judgment, without reference to any objective standards, formal policy, or procedural safeguards.

**130.** This arbitrary authority to ban a member of the public – especially one engaged in core political speech – mirrors private property rights rather than constitutional limits on government officials. By conditioning Ms. Schmidt's access on her obtaining "prior written permission," Swift effectively elevated herself to the role of gatekeeper of public property, transforming open public forums into restricted spaces subject to her personal approval.

**131.** The stated grounds for the ban – "disrespectful comments" and "foul language" – are vague, subjective, and rooted in the content of Ms. Schmidt's speech rather than any legitimate safety concern. Such reasons are indistinguishable from viewpoint

discrimination, especially given that similarly offensive or vulgar words are tolerated when they appear in district-approved books or when used by favored speakers.

**132.** The notice provided no appeal procedure, no hearing, and no due process protections, depriving Ms. Schmidt of her constitutional rights under the First and Fourteenth Amendments.  The letter read as follows:

Re: Notice of No Trespass on USD 497 District Property

Dear Ms. Schmidt,

I am writing to provide you this Notice of No Trespass effective March 10, 2025. You are not allowed on any USD 497 property without prior written permission until May 9, 2025. If you choose to come onto district property without written permission and refuse to leave upon request, the Lawrence Police Department will be called to enforce this Notice of No Trespass.

This Notice of No Trespass is being issued because of your disruptive behavior at the USD 497 Board of Education meeting on March 10, 2025. You were removed from the building for making disrespectful comments, using foul language during a public meeting, and refusing to leave when requested. You were notified at that time by the Lawrence Police Department that this No Trespass order would last for 60 days.

If you would like to meet with district administration, please contact the superintendent's office to arrange a phone or Webex conference.

Thank you for your cooperation in honoring this notice. If you have questions, please let me know.

Respectfully,

*Jeanice Swift*

Dr. Jeanice Swift
Superintendent of Schools
Lawrence Public Schools

CC: Lawrence Police Department

**133.** The post hoc reasoning offered by Defendant Swift in her March 24, 2025 letter was both false and pretextual. Swift falsely asserted that Ms. Schmidt engaged in "disruptive behavior" when in fact Ms. Schmidt was exercising her allotted speaking time in the public comment period. Swift further mischaracterized the events by

49

claiming that Ms. Schmidt had been "requested" to leave when in reality she was ordered to leave the meeting room, the building, and even the parking lot under threat of police enforcement. The asserted basis for her removal – that Ms. Schmidt's speech was "disrespectful" – is inherently subjective, undefined, and reveals that the ban was imposed as retaliation for disfavored viewpoints rather than for any legitimate time, place, or manner concern.

**134.** Defendant Swift's March 24, 2025 ban on Ms. Schmidt was not an isolated incident but part of a broader pattern of retaliatory no-trespass orders imposed on disfavored speakers, including Dr. Spiehs and Mr. Eravi. In each instance, USD 497 officials invoked vague allegations such as "disruptive," "foul," or "disrespectful" behavior to justify exclusion from public property, when in reality the common denominator was speech critical of the Board and its policies. These bans were issued without notice, hearing, or opportunity to appeal, granting Swift and other Board officials unbridled discretion to silence critics. This custom and practice of issuing viewpoint-based, indefinite or arbitrary bans against community members constitutes retaliation for protected First Amendment activity and violates due process under the Fourteenth Amendment.

**135.** The repeated use of trespass bans against Ms. Schmidt, Dr. Spiehs, and Mr. Eravi sends a clear and intimidating message to the broader community: that speaking critically of the Board or quoting from its own curriculum materials risks permanent exclusion from public property and even criminal trespass charges. This practice chills the speech of ordinary citizens who reasonably fear retaliation,

creating a coercive environment in which only flattering or Board-approved viewpoints are safe to express. Such viewpoint-based retaliation suppresses robust debate on matters of public concern, undermines democratic accountability, and strikes at the heart of the First Amendment.

**136.** Federal courts have already recognized the constitutional dangers of these practices. In *Schmidt v. Huff,* Judge Melgren struck down a similar trespass ban as unconstitutional, holding that a school district may not silence parents for quoting from materials available in school libraries. Likewise, in *Moms for Liberty v. Brevard Pub. Sch.*, the Eleventh Circuit condemned the arbitrary interruption of parents during public comment as unconstitutional viewpoint discrimination. USD 497's actions mirror the very conduct those courts have rejected – using vague and subjective speech rules as a pretext to suppress criticism of curriculum and library materials – making its policies and enforcement plainly unconstitutional.

**137.** On March 24, 2025, Ms. Schmidt appeared by Webex.  The following dialogue took place:

> **Schmidt**: Okay. Good evening. When I learned about your policy regarding obscene language weeks ago I was shocked because I know the kind of reading material you provide the students in this district and they have a lot of obscene words in them. I was surprised because there is no way that the board members are holding their meetings to a higher standard than they have for their students. I don't know if you realize this, but you are teaching minors about obscene language and sex, however you also are expecting those future adults not to say those words in your presence. Make it make sense. I know you are not a fan of the unconventional way I have chosen to communicate this concern I have with you, but I am trying to get you to see the hypocrisy and your policy. You might be offended by the words I have said during public comment, but I am offended by the words you are providing, promoting and allowing minors to read. We are clearly not the same. So last meeting I said some words that you did not like, but like I said those same words are available in your libraries for adolescence to read. I'm going to read some

passages from books that are in your District that use those same words. "Tranny" by Laura Jane Grace. "Give me the fucking hormones now, you fucking asshole. I shouted and pounded my fist on the counter. Nearby shoppers stopped to look at this hysterical person shaking with anger, tears running down my face. I've seen all of the fucking doctors that I was supposed to, I passed all the damn tests, here's my fucking driver's license, now can I please have the fucking pills? I'd lost, and how I could ever get it back, or kill the son of a bitch who stole it from me. We were trying to be a family: husband and wife and all that bullshit." This book says fuck 99 times...-

(**Jones** interrupting): Carrie that's your warning

(Webex feed is muted as Schmidt continues to speak and say "...bitch 1 time, shit" yet the only word heard is "it 38 times")

**Schmidt**: -it 38 times. Red, White, and Royal Blue by Casey McQuiston. Through his throbbing hangover, he's got a suspicion all these feelings are why he held off on fucking Henry for so long. You're literally putting your dick in the leader of a foreign state, who is a man, at the biggest political event before the election, in a hotel full of reporters, in a city full of cameras, in a race close enough to fucking hinge on some bullshit like this, like a manifestation of my fucking stress dreams, and you're asking me not to tell the president about it? We don't have time to deal with this, and your mother has um enough to manage without having to process her son's fucking quarter-life NATO sexual crisis, so I won't tell her. But once the conversation is over, you have to. This book says shit 82 times fuck one-hundred fifty...

(Schmidt is completely disconnected from Webex and did not hear the statements Jones said below after being disconnected)

**Jones**: Hey Carrie, that's your last, that's your warning. I do want to point something out. We have provided you policy IF several times, but to be clear, you have never stepped foot in a library, in our district, nor do you know anything about our curriculum. So, I appreciate your input, but we have given you the policy for making complaints about books.

**138.** USD 497's censorship and trespass practices are not isolated incidents but part of a recurring pattern of retaliation and selective enforcement. The Board tolerates and even encourages favorable or complimentary speech about staff, students, and curriculum, yet repeatedly silences and punishes critical viewpoints – whether by cutting off microphones, disconnecting Webex access, or issuing trespass notices. This deliberate disparity between how positive speech and negative speech are treated

reveals that the District's true aim is not maintaining decorum, but suppressing dissent. Such viewpoint-based enforcement is constitutionally intolerable and squarely within the pattern of retaliation condemned in *Schmidt v. Huff* and *Moms for Liberty v. Brevard Pub. Sch.*

**139.** The IF policy cannot restrain protected speech, is not a reasonable time place and manner restriction, and does not apply to Ms. Schmidt as it applies to parents of USD497 students.

**140.** Defendants' reliance on Policy IF as a tool for silencing Ms. Schmidt is a pretextual misuse of that policy. Policy IF applies only to "students or parents of currently enrolled students" pursuing internal complaints about textbooks and instructional materials. Ms. Schmidt is neither, and she was not attempting to file a formal complaint – she was engaging in protected speech during the designated public comment period. By invoking Policy IF as a gag rule, defendants invented an extra-statutory barrier to exclude disfavored viewpoints.

**141.** Even if Policy IF applied, it cannot override constitutional protections. The First Amendment does not permit a school board to prohibit speech in a designated public forum merely because that speech is critical of curriculum or quotes verbatim from district-approved books. Using Policy IF to silence Ms. Schmidt transforms a voluntary internal grievance procedure into an unconstitutional prior restraint on public discourse.

**142.** Beyond the First Amendment, defendants' actions also implicate the Fourteenth Amendment's Due Process Clause. Defendant Swift's unilateral issuance of a

trespass ban against Ms. Schmidt illustrates the lack of any neutral process or meaningful opportunity to contest the deprivation of her rights. Swift's letter asserted discretionary authority to prohibit Ms. Schmidt from all USD 497 property for sixty days, but provided no appeal mechanism, no notice-and-hearing procedure, and no standards constraining her discretion.

**143.** This unchecked authority effectively elevates the superintendent to the role of "judge, jury, and executioner" in deciding who may access public property. Federal courts have consistently held that such unbounded discretion in government officials – particularly when exercised to suppress speech – is unconstitutional. *See City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 757 (1988).

**144.** The combination of vague speech restrictions, selective enforcement, and unilateral trespass authority reflects a pattern of retaliation and censorship indistinguishable from prior cases in which federal courts struck down school board policies as unconstitutional. Here, as in *Schmidt v. Huff and Moms for Liberty,* the Board and its officials have weaponized vague policies not to preserve order, but to suppress viewpoints they dislike.

### APRIL 14, 2025 MEETING

**145.** On a later date, Dr. Spiehs appeared by Webex during the public comment period of a Board meeting. He attempted to address the Board's prior enforcement of its "obscene language" rule by referencing statements made at an earlier meeting and citing federal case law. Dr. Spiehs noted that another speaker had previously stated, "the actual disruption is coming from you assholes up there," and asked whether the

Board agreed with that assessment. Presiding officer Jones repeatedly interrupted, instructing Dr. Spiehs not to repeat the words that had been spoken on the record and published in local media. Dr. Spiehs then attempted to read from Moms for Liberty v. Brevard County School Board, in which the federal court held that the word "shit," though impolite, is not obscene. Jones again interrupted, declaring that Dr. Spiehs could not repeat the word "shit" even when quoting from a federal judicial opinion. When Dr. Spiehs insisted that his viewpoint required citing the case verbatim, Jones ordered his Webex connection terminated before the conclusion of his allotted time:

**Jones** : All right so we're going to move on now to uh Dr Spiehs and he is also joining us from outside of the district um and uh wishes to talk about previous board meetings. Dr Spiehs?
**Spiehs**: Can you hear me?
**Jones**: We can. Welcome
**Spiehs**: All right I want to speak about uh speak to things that were said on the record at this meeting on February 24th 2025 and I want to ask you guys a question about that. At that meeting a speaker discussed a recent court case ruling and that ruling spoke to the fact that speakers can't be disrupting the meeting with their speech during general public comment even if using vulgar language which you have removed me from meetings here for quote unquote disrupting the meeting because of the words I use. After discussing that the speaker at that meeting then said quote and this is on the record here, this is what that speaker said "So the actual disruption is coming from you assholes up there". Would you agree or disagree that you assholes are actually the disruption?…
(**Jones** interrupting) uh Justin can you refrain, I think you're making a point. We'd like to hear it. Can you refrain from using
**Spiehs**: Yeah the point is that uh…
(**Jones** interrupting): Can you go back 2 seconds? Justin I'm going to give you back your time. One moment. Can you go back 5 seconds?
**Spiehs**: We can't talk about things that were spoken at a meeting before?…
(**Jones** interrupting) No you can. I'm going to give, I want to make sure you have your time. Just a second
**Spiehs**: So again at that meeting this that speaker said quote So the actual disruption is coming from you assholes up there
(**Jones** interrupting): Justin…

**Spiehs**: …and I was wondering if you guys agree or disagree with that. At a previous meeting Kelly you stopped me from speaking because you said I couldn't use quote obscene language. And matter of fact LJ World used that same phrase "obscene language" when they reported on these meetings. So I want to read to you from the case of Mom's versus uh Moms for Liberty versus Brevard Public Schools because the ruling on the use of obscene language and what is and what is not allowed. And so in that ruling the court writes "During the incident Moms for Liberty cites a member uh shared her concern that her child's elementary school library contained inappropriate books. She began reading one which detailed an in school sexual encounter: 'I swung the uh door open letting a soft light from the hallway shine a spotlight on them. 'Shit' she muttered." Then the court writes "Belford quickly interrupted the speaker when she got to the word 'shit'. That word though not polite is not obscene."…

(**Jones** interrupting): Justin, can you try to make your comments without utilizing uh inappropriate language?

**Spiehs**: So I can't now I can't enlighten you guys on what district courts have ruled on the word shit at public meetings? Is that is that what you're trying to say?…

(**Jones** interrupting): Yes

**Spiehs**: And so that that's what that's what I've been saying this whole time is that the using the word shit is allowed…

(**Jones** interrupting) you can definitely share your viewpoint without doing that. So if you would

**Spiehs**: Well but the viewpoint is that the word shit is allowed and my viewpoint is that I'm reading from this case that said that…

(**Jones** interrupting and directing staff to disconnect Webex): Ok. I'm trying here. That's enough. Thank you

**Spiehs**: …and so matter of fact the court…

(Webex disconnected before time expired)

**146.** The censorship of Dr. Spiehs' comments is particularly egregious because he was quoting verbatim from a published federal district court decision directly on point, *Moms for Liberty v. Brevard County School Board*. By forbidding him from reading the court's words on the ground that they contained the term "shit," the Board demonstrated that it was not regulating "obscenity" at all, but was instead engaging in impermissible viewpoint discrimination. A public speaker cannot be barred from quoting judicial precedent on the precise constitutional issue under discussion. This selective enforcement confirms that the Board's policies and practices operate as a

prior restraint on protected speech, are unconstitutionally vague, and are applied in a retaliatory and discriminatory manner.

147.   The experiences of Ms. Schmidt, Mr. Eravi, and Dr. Spiehs reveal a consistent pattern: speakers who criticize the District's policies, curriculum, or board members are interrupted, muted, disconnected, or even trespassed from district property, while those who praise staff or students are permitted to speak without restriction. This double standard makes clear that the District's restrictions are not genuinely about maintaining decorum, but about silencing dissent and suppressing viewpoints disfavored by the Board. Such selective enforcement mirrors the unconstitutional practices rejected in *Schmidt v. Huff* and *Moms for Liberty v. Brevard Pub. Sch.*, and confirms that USD 497 has created a public-comment forum where speech is policed on the basis of viewpoint.

### APRIL 28, 2025 MEETING

148. In the Board's published agenda it omitted providing a public comment section. On April 28, 2025, the board conducted a meeting without a public comment section.

149. USD 497 spokesperson Julie Boyle did not give a reason why. She stated that "public comment will be part of the board's May 12, 2025, meeting agenda."

150. Mr. Eravi came to the meeting in part to protest the Board's arbitrary decision to eliminate public comments. Mr. Eravi held an 8 x 12 piece of paper stating "My public comment" with an arrow pointing at his white T shirt. The message on his shirt is depicted below:



**151.** Although the Board claims to have a policy that "signs" cannot be displayed, nothing was said to Mr. Eravi about either his paper or his shirt by any board member. Although the Board claimed it has a policy prohibiting "signs" which had no definition of what constituted a "sign," Mr. Eravi carried what could be considered a "sign" or "signs" into the Board's meeting. The Board did not warn or otherwise tell Mr. Eravi that his "sign" or "signs" were not permitted or violated any rule.

**152.** After a meeting adjourns, it is not uncommon for individuals, including audience members, employees, or staff to approach the dais to engage the board or board members in conversation.

**153.** After the meeting adjourned, Mr. Eravi approached the board's dais about his "signs" which he was displaying during the meeting. Two city police officers Bishop and officer Bailey Salsbury were present when Mr. Eravi spoke to the board at the dais after the meeting ended.

**154.** Mr. Eravi spoke to the Board members who were seated behind the dais about how arbitrary and vague its speaking policy was. When Mr. Eravi said "bullshit" and "fucking voicemails" Kimball told Lawrence police who were present "we need help

here" meaning she was directing the police to have Mr. Eravi either removed or silenced.

155. Mr. Eravi did not commit any crime at the USD497 open meeting on April 28, 2025.

156. Mr. Eravi did not commit any crime in the parking lot adjacent to the USD497 meeting room building on April 28, 2025.

157. While in the parking lot after the April 28, 2025 meeting, Mr. Eravi engaged in a dialogue with Officer Salsbury. Mr. Eravi asserted that he had not broken any law, had merely spoken words protected by the First Amendment, and that the police were being improperly used as "private security" for board members' feelings. Officer Salsbury confirmed that Eravi was not under arrest and had committed no crime, but nonetheless remained on scene to enforce the Board's directive that he leave the premises. This exchange underscored that law enforcement was acting not to preserve public safety or enforce any statute, but to reinforce the Board's vague and unconstitutional censorship regime.

158. Defendant Jones had no legal authority to order Mr. Eravi to leave the meeting room, particularly after the meeting had formally adjourned. Nor did Jones have legal authority to compel Mr. Eravi to exit the building or the adjacent public parking lot.

159. Mr. Eravi's protected speech to the Board after adjournment did not disrupt any ongoing meeting or official business of the Board.

**160.** At no time while Mr. Eravi remained in the building did any board member or Superintendent Swift state that Mr. Eravi was being trespassed from USD 497 property.

**161.** Because of the close proximity and physical presence of armed police officers responding to Board members' cues, it was reasonably communicated to Mr. Eravi that unless he stopped speaking and left the room, he would be arrested.

**162.** Defendant Jones's statement "you need to leave" did not lawfully inform Mr. Eravi that he was trespassed from the building, much less that he was prohibited from standing in the public parking lot after adjournment.

**163.** After the meeting, Mr. Eravi remained in the public parking lot to conduct interviews and videotape for his Lawrence Accountability YouTube channel, documenting whether exiting Board members would respond to questions about what had transpired inside.

**164.** Police officers were present when Mr. Eravi began asking questions of Board members as they exited into the parking lot.

**165.** When Defendant Jones was questioned by Mr. Eravi, Officer Bishop asserted that Jones had "trespassed" Mr. Eravi from both the building and the parking lot. Bishop further claimed that Jones had "ordered you to be trespassed" and would "mail you a letter, just like last time." Bishop threatened Mr. Eravi with arrest if he did not immediately leave the parking lot.

**166.** Board member Byers also told Mr. Eravi, "as a board member, I can tell you that you are trespassed." At no time, however, did the Board include any agenda item

regarding trespassing Mr. Eravi, nor did the Board ever vote in an open meeting to authorize such action.

**167.** After initially being told to leave, Mr. Eravi walked around the building to the north exit, where he saw Defendant Jones departing

**168.** The recorded dialogue in the parking lot went like this:

**Eravi**: You guys going to quit throwing people out? Kelly Jones? You going to quit shutting people down in here and treating them like shit? You're an elected official lady, for you to hide out inside like that is a joke
**Jones**: Back away from me
**Eravi**: For you to hide out inside like that is a joke. You're an elected official. You have no reason to act that way. You're an elected official
**Bishop**: At this point
**Eravi**: Don't run interference on me
**Bishop**: She's asking That you are
**Eravi**: She's an elected official
**Bishop**: Trespassed from this
**Eravi**: no
**Bishop**: and that you are to
**Eravi**: negative
**Bishop**: leave the property
**Eravi**: You guys are going to trespass me now? For what?
**Bishop**: Because Kelly Jones ordered you to be trespassed.
**Eravi**: Because Kelly Jones ordered me to be trespassed?
**Bishop**: So, it's time that you need to go
**Eravi**: Kelly Jones hasn't told me that I'm trespassed. So, Kelly Jones is going to need to tell…
**Bishop**: no, she doesn't have to tell…
**Eravi**: Yes, she does, you can't do this on behalf of her. She has to be the one to say it.
**Bishop**: She'll mail you a letter too, just like last time
**Eravi**: So, how long am I being trespassed for?
**Bishop**: I don't know, at least for now you need to leave.
**Eravi**: So, you guys are really going to trespass me for constitutionally protected activity guys?  I've made no threats, I've done nothing other than stand out here and ask questions, and you guys are going to literally trespass me for constitutionally… (turning to Bishop) Are you really going to do this?
**Bishop**: Yes
**Eravi**: You are?
**Bishop**: Yes, please leave Michael

**Eravi**: Kelly? Is this what you want? (turning back to Bishop) I haven't heard her tell me, and you can't just…, you can't just trespass me yourself. She has to be the one to tell me

**Bishop**: We do it all the time

**Eravi**: She has to be the one to tell me. Nobody has told me I'm trespassed from here but you

**Bishop**: You need to leave, Michael, you need to leave

**Eravi**: She has to be the one to tell me, don't you know that?

**Bishop**: Michael, you need to leave

**Eravi**: I understand, and once she tells me that I'm trespassed, I will leave

**Bishop**: We do it all the time

**Eravi**: Once she tells me that I'm trespassed, I'll leave

**Byers:** As a board member, I can tell you that you are trespassed

**Eravi**: Ok, so you're going to take this for her? (turning to Bishop) And it's under threat of arrest, right?

**Bishop**: You need to leave

**Eravi**: If I don't leave, I will be arrested, correct?

**Bishop**: Correct

**Eravi**: Thank you, that's all I needed. You'll have another lawsuit coming Kelly Jones, and Bob Byers this time. I wouldn't have thrown yourself under the bus like that, Bob

**Eravi**: (leaving) I got what I wanted Kelly. I will be suing your asses. That was a stupid move. Bailey, you're in it too man. That was a stupid move. Send me a letter, be sure to trespass me for at least a year. At least a year. Because I want a good lawsuit out of this. Motherfuckers. That was straight up constitutionally protected activity lady. And you know you guys are screwed on this one. Screwed. Screwed bad. Screwed

**169.** On May 1, 2025, Mr. Eravi received a letter from Defendant Swift stating that he was permanently banned from all USD 497 property. The letter read: "You are hereby issued a Notice of No Trespass effective April 28; you are permanently prohibited from accessing all USD 497 school buildings and locations." Swift claimed this lifetime ban was based on "unsafe, harassing and threatening behavior you demonstrated in the parking lot following the Board meeting on Monday, April 28, 2025."

**170.** However, Swift's reasoning does not withstand scrutiny, as both Officer Bishop and Board member Byers had already declared to Mr. Eravi in real time on April 28, 2025, that he was trespassed – before any alleged "unsafe" or "harassing" behavior in the parking lot even occurred.

**171.** Swift's letter then added further post hoc justifications, alleging that:

Notice of No Trespass is being issued because of your behavior following the Board meeting on April 28. 2025. After the conclusion of the board meeting, you approached the board table. raised your voice and yelled obscenities at board members. When you exited the Board meeting☐ instead of leaving the premises, you walked in the opposite direction to the rear of the building waited several minutes for board members to exit the building, positioned yourself next to a board member's car and made harassing and threatening statements toward board members. This behavior occurred in the presence of the district staff members who were in the area at the time. creating an unsafe and threatening environment for all who were present

**172.** In effect, Defendant Swift attempted to decree a personal restraining order against Mr. Eravi without any judicial authority, legal process, or opportunity to be heard, thereby depriving him of constitutional rights. Defendant Swift has no lawful authority to permanently ban any member of the public from accessing USD 497's public property, let alone to do so unilaterally.

**173.** Mr. Eravi's presence posed no safety threat to any Defendant. Public officials' identities and residences are matters of public record, and it is common and constitutionally protected for the press and the public to ask questions of public officials in public forums, including parking lots, even when those officials decline to comment.

**174.** Defendant Swift's stated reasons for imposing a lifetime ban were false, pretextual, and retaliatory. All of Mr. Eravi's conduct – including questioning Board

members in a public parking lot and criticizing their actions – constituted protected First Amendment activity. Punishing that activity with a lifetime exclusion order is unconstitutional viewpoint discrimination and retaliation.

**175.** Swift's letter was false and comprised entirely of post hoc, pretextual reasons for the no-trespass declaration. Mr. Eravi did not create any "unsafe" or "threatening" environment for anyone – particularly given that two armed police officers stood next to him throughout the interaction, while he was unarmed and displayed no unsafe conduct. He did not utter "obscenities" within the meaning of the law, was never instructed to "leave the premises" in any lawful sense, and did not make "harassing" or "threatening" statements as defined under Kansas law toward any board member. The substance of the letter is depicted below:

**Lawrence Public Schools**
110 McDonald Drive
Lawrence, KS 66044


Thursday, May 1, 2025

Mr. Phillip Michael Eravi,

Due to the unsafe, harassing and threatening behavior you demonstrated in the parking lot following the Board meeting on Monday, April 28, 2025, you are hereby issued a Notice of No Trespass effective April 28; you are permanently prohibited from accessing all USD 497 school buildings and locations.

This Notice of No Trespass is being issued because of your behavior following the Board meeting on April 28, 2025.  After the conclusion of the board meeting, you approached the board table, raised your voice and yelled obscenities at board members. When you exited the Board meeting, instead of leaving the premises, you walked in the opposite direction to the rear of the building, waited several minutes for board members to exit the building, positioned yourself next to a board member's car, and made harassing and threatening statements toward board members. This behavior occurred in the presence of other district staff members who were in the area at the time, creating an unsafe and threatening environment for all who were present.

In the future, your presence at any Lawrence Public Schools location will result in an arrest.

To clarify, you may continue to attend board meetings via Webex and you may also contact me or the board via email.

Thank you for your cooperation in honoring this No Trespass Notice.

Sincerely,

*Jeanice Kerr Swift*

Jeanice Kerr Swift
Superintendent
Lawrence Public Schools

**176.** Defendant Swift's declaration that Mr. Eravi's "presence at any Lawrence Public Schools location will result in an arrest" imposed liberty interests on Mr. Eravi's right to associate, petition government, and to participate in forums that USD497 has

divested itself of control over individual attendance by contractual agreement such as events occurring on USD497 property on non-school days or hours.

## MAY 12, 2025 MEETING

**177.** Mr. Eravi appeared by Webex at the Board's May 12, 2025, meeting. The dialogue was as follows:

**Kimball**: First up will be Michael. Michael, are you there?
**Eravi**: Yeah, can you hear me?
**Kimball**: Yes, we can hear you
**Eravi**: So, now that everybody's present, except for I guess Kelly Jones took off. Umm, I'm sure she's got more important matters to contend with than just being president of the school board. I wanted to revisit how this whole thing came about with this permanent ban that you, you've unconstitutionally enacted. You know, back in January, you had a situation developing in your schools. At the same time, you had an individual speaker in the school board that you didn't want to hear from. So, you decided to unconstitutionally shut that person down. I sent you an email saying that I would come in there and challenge that aspect of your tyranny… shutting someone down unconstitutionally during their public comment. And at the same time, you know, you've got things going on in your school district that I guess you, you might have wanted to not talk about. So, you started playing games with public comment. So, I came in there in February, and you know, Kelly Jones and I had this little charade for about 30 minutes where she was trying to control what I say and trying to get the police to control me, and that didn't work. So, obviously there was no crime. But your superintendent still trespassed me from school district property for 60 days. That's a little difficult, since it's public property, and there was no crime, obviously by police officer standards. So, during that time, you know, things started breaking, news started breaking about a teacher, you know, doing these strange tests on kids' tongues. You know, we had quotes like "my kid was sexually assaulted by your employee". There was uh, actually a cartoon, "My child was bullied to the brink of suicide" was one of the quotes. Another quote was, "It took a restraining order to protect my kid in your school". But you guys, instead of paying attention to those things you were sweeping under the rug, instead, you decided to make a spectacle of public comment. And all people were saying is that your policies are bullshit
**Kimball**: Michael, That's your warning
Eravi: So, I get a warning. Gotcha. But that's the fact. And you guys are so worried about people being so mean to you. And… We move forward. I come back in the room. You don't have public comment because you don't want to hear from the public still. You move public comment to the end. At the end of the meeting last time, I go outside and ask elected leaders questions as they're leaving the building.

And your superintendent decides to unconstitutionally ban me for permanent, lifetime. You guys have that cartoon in mind? The one that says, "Everyone look how mean they're being to me"? Instead of paying attention to your students you're sweeping under the rugs? Your policies really are bullshit
**Kimball** (stopping time early): Your time's expired, thank you

178. Dr. Spiehs appeared by Webex at the May 12, 2025 Board meeting. The dialogue

went like this:

**Kimball**: Okay our next commenter is Justin.
**Spiehs:** Can you hear me?
**Kimball**: Yes we can. You may proceed
**Spiehs**: Can you hear me?
**Kimball**: We can hear you, you may proceed.
**Spiehs**: All right my name is Dr Justin Spiehs, my name is Dr Justin Spiehs uh your guys' policy that you just read there on general public comment says that complaints about staff are not allowed and so do you think that that is or is not viewpoint discrimination that uh only positive things can be said about your precious staff there? So we all just had to sit through the superintendents report there where she gushed over staff and then we listened to the Avid presenters just say positive things about uh staff as well but if I were to say that the superintendent Swift is a tyrant for not allowing me to go to church on school district property because she's imposed an unconstitutional permanent ban on me uh for no reason would that be allowed? Would that complaint be allowed? That's part of the lawsuit that I filed against all you guys there is that you allowed positive things to be said but not negative things. And so think about it anybody that tunes into your guys' precious meetings here will only see these positive things that are said about the school district but anything negative whatsoever uh has to be shielded from the eyes of the public in an executive session. So that's what's called viewpoint discrimination. And so a couple meetings ago there Shannon Kimball you sat there and played the victim and said that you'd gotten some voicemails from uh people that were watching the meetings and you classified it as threats bullying and intimidation and uh we got those voicemails through an open records request. And so I just want to read some of them and I want to I want to show uh how you're a lying beotch, Shannon for what you said up there…
**(Kimball** interrupting) Okay, that's your warning Justin thank you
**Spiehs**: …and so one of the emails says quote Hey you dirty cunt stop breaking the law…
**(Kimball** interrupting): Okay, you're done Justin thank you. Cut him off
Spiehs: …we need less people like you in positions…
                    (Webex disconnected before time expired)

**179.** The May 12, 2025 meeting again demonstrated the Board's selective enforcement of its rules. While district officials and invited presenters were permitted to lavish praise on staff and programs without restriction, both Mr. Eravi and Dr. Spiehs were silenced, warned, and disconnected when they criticized the District or its leadership, even while speaking during their allotted public comment time.

**180.** The warnings and disconnections were not triggered by any genuine disruption. Instead, they were imposed because the speakers' criticisms were pointed, unfavorable, or couched in language the Board claimed to find offensive. This pattern is consistent with the unconstitutional viewpoint discrimination already documented in prior meetings, where identical or harsher words were tolerated when they appeared in books read aloud or when they were uttered in non-critical contexts.

**181.** The Board's conduct on May 12, 2025 thus provides further proof that its "decorum" policy and its ad hoc warnings are not content-neutral time, place, or manner regulations. Rather, they operate as tools of retaliation against dissenters. By allowing praise while punishing criticism, defendants entrenched a pattern of censorship squarely prohibited by the First Amendment, as recognized in cases such as *Cohen, Schmidt v. Huff,* and *Moms for Liberty.*

## MAY 27, 2025 MEETING

**182.** Dr. Spiehs spoke on Webex during his allotted time with the following dialogue:

**Jones**: Okay we have one uh virtual comment so uh Dr Spiehs. Can we pause the, till we get him on there? Dr. Spiehs are you with us?
**Spiehs**: Can you hear me? Can you hear me?
**Kimball**: We can. Welcome
**Spiehs**: All right my name is Dr Justin Spiehs. The USD497 school board is enforcing an unconstitutional policy that prohibits speakers from using foul

language during general public comment. This board has removed me from several meetings for the words I used while speaking during my general public comment time. In order to speak here at the meetings people must sign up via email prior to the start of the meeting and when signing up to speak during general public comment speakers are asked to provide a topic they wish to discuss. For tonight's meeting I signed up and the school district approved my topic. In my signup email I made it clear that the topic I wish to discuss and the words I'm going to use to discuss that topic are quote How Kelly Jones's restriction of free speech during general public comment is complete fucking bullshit…

(**Kimball** interrupting): That's your warning

**Spiehs**: …close quote. Well if you have a problem with the words I was going to use here tonight then why did you approve me to speak using those words? Seems like you gave me the okay to say those words otherwise you would not approve me to speak those words right now there Kelly. So I've been trying to figure out which words are not allowed here during general public comment. I've asked you all for a list of prohibited words but I haven't heard back from you on that. Other people have asked you for a list as well and you haven't provided one to them either. So no one knows what is allowed and not allowed other than the vague "foul language" you say is prohibited. So tonight I want to let the community know what is and is not allowed here in case they want to come speak here someday. And this is what I've learned so far: you can say dumbass and damn and hell. You can spell f-u-c-k-i-n-g but you can't say fucking…

(**Kimball** interrupting): Okay

**Spiehs**: You can't say beotch even though it is not a cuss word you…

(Webex disconnected before time expired)

**Kimball**: Thank you Dr Spiehs. Okay, um and we'll move on to folks that are here.

**183.** Ms. Schmidt spoke next in person with the following dialogue:

**Jones**: Welcome Carrie, I don't have the topic, but I believe you typically talk about banning books

**Schmidt**: Okay. You are consistently interrupting and banning people during their designated three minutes to speak to the community, due to the words you have defined as obscene. However, the reading material you are providing to minors use those same words. So again, I am here to inform you of your double standard. I'm going to start off reading from a book called Concrete Rose by Angie Thomas. It is located at Southwest Middle School, Billy Mills Middle School and both high schools. It says ass 109 times, shit…

(**Jones** interrupting):Carrie…

**Schmidt**: …151 times…

(**Jones** interrupting): Can you please explain your point without using that word?

**Schmidt**: …Bitch seven…

(**Jones** interrupting): Okay you need to sit down

**Schmidt**: …times. Cock…
(**Jones** interrupting): Carrie, that's it
**Schmidt**: …two…
    (unknown to Schmidt Jones mutes Schmidt's microphone as Ms. Schmidt
            continues to read while her 3-minute timer is running)
(**Jones** interrupting): that's it. Do you need help leaving?
 (Unknown to Schmidt her microphone is muted and continues to read her speech)
**Jones**: Do you need help?
    (Schmidt continues to read her speech unaware her microphone was muted)
(**Jones** to police officers in the room): Can you help her leave please? Oh you
cannot
(**Swift** to Jones): We'll no trespass her
(**Jones** to Swift): Okay
(**Jones** to police officers): Got it thanks
**Schmidt**: [continues to read her speech with muted microphone)
(**Swift** to Jones): So she'll be no trespassed
**Jones**: Okay that's three. Carrie, you know you're at your 3-minutes could you sit
down please? Okay, thanks for coming up to Lawrence

**184.** On May 27, Chris Flowers appeared in person and spoke during his allotted time

at the USD497 open meeting.  Flowers stated "so far this meeting's been bitchin' and

I just wanna say I came here I'm I want to start with this new noon sign up thing."

Mr. Flowers was not warned by the presiding board member.

**185.**   The treatment of Mr. Flowers on May 27, 2025 underscores the arbitrary and

discriminatory nature of the Board's enforcement. His use of the word "bitchin'"

during public comment was tolerated without interruption or warning, in stark

contrast to the immediate silencing of Dr. Spiehs and Ms. Schmidt for their critical

speech that included identical or less severe words.

**186.** This disparity demonstrates that the Board does not object to words themselves,

but rather to the viewpoints expressed. When language is used in a positive or

humorous context, the Board allows it. When the same or milder language is used to

criticize the Board or its policies, the speaker is warned, muted, or disconnected, and even subjected to trespass orders.

**187.** The selective enforcement on May 27, 2025 provides further proof that the Board's claimed "decency" or "decorum" policy is not applied in a content-neutral manner. Instead, it is wielded as a weapon to suppress unfavorable viewpoints, a form of unconstitutional retaliation forbidden.

**188.** The May 27, 2025 meeting was not an isolated incident but part of a continuous pattern in which USD 497 tolerates profane or colloquial language when used to compliment or amuse, yet penalizes the same or lesser language when used to criticize. This recurring double standard across multiple meetings confirms that the District's enforcement of its public comment policy is a pretext for viewpoint discrimination, not a legitimate effort to maintain decorum.

**189.** When the May 27, 2025 meeting ended, Ms. Schmidt approached defendant Jones in the parking lot and in a calm, conversational tone attempted to ask why the Board allowed favorable speech with profanity (such as Mr. Flowers' "bitchin'" remark) but censored her speech with the same or lesser words. Jones immediately cut Schmidt off, repeatedly demanding that she "step back" and threatening that Schmidt would be "no trespassed." Schmidt neither raised her voice, displayed anger, nor made any threat. Instead, she asked questions a constituent would normally direct to an elected official. Despite the absence of disruption or danger, Jones invoked the police presence to frame Schmidt's questions as a safety threat. Officer Bishop then told Schmidt she was "trespassed," though no written order existed, and

no lawful directive to leave had been issued. This encounter mirrors the unlawful escalation against Mr. Eravi in April – where ordinary questioning of elected officials in a public space was mischaracterized as "threatening" to justify retaliatory exclusion.

**190.** Defendant Jones had no legal authority to issue an on-the-spot "no-trespass" order in the parking lot, nor could Officer Bishop lawfully enforce such an order absent proper process. The parking lot of a public school board meeting is a traditional public forum where citizens may approach elected officials with questions. By unilaterally declaring Ms. Schmidt "trespassed," without prior notice, without a Board vote, without a written order, and without any disruptive or threatening conduct to justify it, defendants deprived Ms. Schmidt of both her due process rights and her First Amendment rights. This conduct illustrates a pattern in which Board members conflate protected questioning and criticism with "threatening" behavior, weaponizing trespass threats to silence dissenting voices outside of any lawful procedure.

**191.** The attempted trespass of Ms. Schmidt in the parking lot mirrors the same unconstitutional pattern previously imposed on Dr. Spiehs and Mr. Eravi: defendants fabricate "safety" or "threat" narratives after the fact to justify retaliatory bans. Just as Swift's letters falsely characterized constitutionally protected speech as "harassing" or "unsafe," Jones and Bishop sought to recast Ms. Schmidt's ordinary questioning as threatening conduct. These post hoc, pretextual justifications reveal that defendants are not neutrally enforcing safety policies but are instead engaging

in a coordinated practice of silencing, punishing, and excluding speakers based solely on their viewpoints.

## JUNE 9, 2025 MEETING

192. On June 9, 2025, Mr. Eravi spoke by Webex at the open meeting and the following dialogue occurred:

**Eravi**: Oh, You can hear me?
**Jones**: Yea, we can now
**Eravi**: See, that's the difficult thing about this Webex thing. But ah, Good evening everyone, and Fraulein Jones. I wanted to start with just a little comment, Ire Politik ist Schwachsinn. I've said that a number of times, and I don't understand what's going on with the board.
I look here, and I see a comment from Dr Courtney talking about book banners, trying to usurp an issue. I don't remember anybody wanting to ban a book. Why are you guys fucking lying to us?
**Jones**: Ok Michael, that's your warning
**Eravi**: A warning? Well, Scheizafunden. I don't understand that either. I get a warning at two minutes, now if I was in person, where would we be right now? Would you be asking the Police to "help me out"?  Cause that's what you Schweinzukas did two weeks er ah, several months ago, two weeks ago, three weeks ago. You've done it how many meetings now? They won't help you. Just so you're aware "Ire Politik ist Schwachsinn" means, your policies are bullshit
**Jones**: Kay Michael, that's the end of the
**Eravi**: No, that's not the end of the. I've got what, a minute ten left…
  (Mr. Eravi is disconnected with 1:10 minutes remaining in his speaking time)

193. Dr. Spiehs spoke via Webex and the following dialogue occurred:

**Spiehs**: Man, I got to say that really sounded like foul language uh spoken in a different language when Michael was talking there. And you didn't have a problem with that. So why is that foul language allowed? I'm sure there's some German foreign exchange students that are listening that you got to protect their ears for right? What's the difference there? So my name is Dr. Justin Spiehs. It's funny how the local Democrats bitch about Trump trying to take away power and limiting protests on campus which he does. This past year has seen KU, the city commission and you all start implementing changes to stifle public involvement. Why is that foul language allowed right there? So it's funny how the local Democrats bitch about Trump that b-i-t-c-h used like that is allowed but bitch in another way isn't allowed? Is that what's going on here?…
**(Jones** interrupting): Dr. Spiehs

**Spiehs**: …so I noticed in last week, uh last meeting you allowed a speaker to say exactly what I just said right there without warning him either. So he was allowed to say, heaven forbid I say here b-i -t-c-h and I'm allowed to say it here now as well. Doesn't make any sense. So in order to better be able to exercise our rights at your meetings, I'm starting a petition, a petition that aims to help citizens know what can and cannot be used at your meetings here. And I'd like for each of you to consider signing it. The name of it is the Full Uncensored Communication At Meetings petition and that acronym is F.U.C.A.M. which is pronounced fuck am…
**(Jones** interrupting): Dr. Spiehs. That's your warning
**Spiehs**: …and so I would like to have you guys consider signing the F.U.C.A.M. commission, uh petition that I'm circulating…
**(Jones** interrupting): Dr. Spiehs
**Spiehs**: …so is it allowed to say uh F.U.C.A.M. like that? Is that what it is?…
**(Jones** interrupting): No
**Spiehs**: But you can't say F.U.C.A.M. in a different way?…
**(Jones** interrupting): Okay. Please do send us the petition. Okay. Thank you
**Spiehs**: You want me to send you the F.U.C.A.M. petition? Is that what you're saying?
**Jones**: Yes
      (Webex disconnected prior to Dr. Spiehs' allotted three minutes)

194. The June 9, 2025 events again demonstrate defendants' arbitrary and viewpoint-based censorship. Mr. Eravi was disconnected more than a minute before his allotted time expired for merely questioning the Board's dishonesty and describing its policies as "bullshit," while Dr. Spiehs was warned and then cut off for using acronyms and petitions satirizing the censorship itself. Meanwhile, comparable language – when complimentary, humorous, or framed by other speakers – was tolerated. This selective enforcement underscores that the Board is not neutrally applying any content-based rule, but instead weaponizing its "foul language" prohibition as a pretext to silence critics, mirroring the unconstitutional patterns condemned in *Cohen, Moms.* and *Schmidt*.

195. The pretextual nature of defendants' censorship is further revealed by the fact that both Mr. Eravi and Dr. Spiehs had their speaking requests approved in advance.

Each was required to submit a topic before the meeting, and the Board expressly authorized those topics – including Dr. Spiehs's description that he intended to address how "Kelly Jones's restriction of free speech during general public comment is complete fucking bullshit." Having granted permission for those subjects, the Board then silenced the speakers midstream under the guise of enforcing its "foul language" policy. This bait-and-switch illustrates that the true motive was not the regulation of profanity but the suppression of dissenting viewpoints, further confirming the unconstitutional retaliation at work.

**196.** This arbitrary and inconsistent application of the policy produces a profound chilling effect. Citizens who might otherwise speak at Board meetings cannot know in advance which words will be tolerated, which will draw a warning, and which will lead to expulsion or even trespass. The absence of a clear or consistently applied standard forces speakers to self-censor for fear of reprisal. By exercising unchecked discretion to silence speech based on its tone or viewpoint, defendants have created an unconstitutional regime of prior restraint that deters robust public participation in matters of civic importance.

### JUNE 23, 2025 MEETING

**197.** Dr. Spiehs spoke on Webex on June 23, 2025, with the following dialogue:

**Spiehs**: Okay my name is Dr. Justin Spiehs. I want to pick up where I left off last meeting when uh I got removed from the meeting while speaking I was telling you guys about a petition that I was wanting to uh have you guys consider signing and the name of that petition is the Full Uncensored Communications At Meetings petition and I was telling you guys that that acronym is F.U.C.A.M. and is pronounced fuck am and you removed me from the meeting Kelly and I just want to say but that's not a that's not a naughty word. The F-U-C-A-M is not a naughty word. And so what do you want me to do about that? You want me to change the

name of my petition because what you say I can't say that in here? I was listening to a speaker in this meeting earlier talking about their organization called uh the P-A-L organization PAL and they got to say their name no problem whatsoever. So what I got to change my name to what make it through your gatekeeping of the words we can say here? I mean it's not my fault that my petition is called that. I mean what do you want me to do about it? I got to change it? No! I mean it loses its meaning if I got to change it to meet your standards there uh Kelly Jones. And so that's also viewpoint discrimination. So you're going to allow someone to come in with their what whatever you know organization it is and they can say it just fine but heaven forbid Justin say F-U-C-A-M. Oh no! Oh look out! And so along with that that goes into my petition or why I need to do a petition is two meetings ago there was a speaker in here that said during general public comment said "Democrats like to bitch about Trump" and I'm still looking for an answer on why he was allowed to say that when b-i-t-c-h when I've been removed from the meetings for saying biotch which ain't even a naughty word again. I mean it you know it's again it's viewpoint discrimination. So you're going to allow one person to come in here and say "bitch" but as soon as I say "bitch" then you know you got to you got to immediately remove me from the meetings. And so that all goes into my petition again that's called the F.U.C.A.M. petition and I'd really like for you guys and everyone out there to consider uh signing the F.U.C.A.M. petition…

(**Jones** interrupting): Okay. Dr. Spiehs

**Spiehs**: …because I mean that's that's what we're that's what we're looking for we're looking for Full Uncensored Communications At Meetings…

(**Jones** interrupting): Okay

**Spiehs**: And so I just invite everyone to consider thinking about if that's what they want if that's what they want then they can sign the F.U.C.A.M. petition so we can start saying "bitch" at the meetings again. I mean Jeez is this America or what?

(**Jones** interrupting): Okay. Dr. Spiehs

**Spiehs**: Bunch of tyrants running the board up there. You guys make me sick with your double standards and your discrimination in viewpoints up there and the words you say that we can't say in there. I mean we're adults here for crying out loud.

**Jones**: Thank you all right um uh Carrie.

198. Ms. Schmidt was given permission to speak via Webex for three minutes with

the following dialogue:

**Schmidt**: I'm going to read a transcript of the conversation that took place in May where I was wrongly accused of harassing and threatening Kelly the fake victim. First I want to say the fake victim is not full of grace, nor is she doing a good job following the Constitution. During my speech my mic was silenced in May and there was a hot mic moment where Miss Superintendent told the fake victim that she would trespass me. I assume she said that because I read cuss words that are

written in one of the books that this district provides to minors. However, the permanent ban letter stated quote You made harassing and threatening statements towards the board president. This behavior created an unsafe and threatening environment for those who were present. End quote Mind you the people present were Officer Lindsay Bishop, the police dog, the fake victim and myself. The fake victim and I were at least over 6 feet apart during the entire interaction. Carrie says Kelly, hey Kelly I have a question. Why is it that you let Chris Fake victim interrupts and says Step back away from me now. Carrie says I, I'm not threatening I'm not threatening I'm asking you a question just like I would if I would be. Fake victim interrupts again and says We will be no trespassing you. That's what's going to happen now. Carrie says Why? Fake victim says You need to get away from me. Carrie says  I'm just asking a question. Just like if you were at Walmart I would ask you the same thing. Fake victim says You would not, you know what you were doing. Fake victim shuts her door while sitting inside of her car. Officer Bishop says "Caaarrie" in a condescending tone. Carrie says to officer Bishop No I would. What am I doing? Officer Bishop to Carrie Let her leave. Mind you, I'm over 6 feet away from the fake victim and standing closer to the police officer and her dog at the entire time. Carrie says to officer Bishop What am I doing? She's a constituent, like I'm a constituent of hers basically. She is in the state of Kansas and she's acting like?" The fake victim starts her car. Carrie says to officer Bishop And I'm going to get trespassed because of this? She's going to trespass me because of this?" Officer Bishop says to the fake victim Hey Kelly just go. Kelly opened her car door while sitting in it. Carrie says You're going to trespass me because of this? Officer Bishop says to the fake victim I would just leave. Fake victim says to officer Bishop "I don't want." Officer Bishop then says to the fake victim See I would just leave. Fake victim says to the officer Bishop Okay. Fake victim shuts her door. Carrie says to officer Bishop Like I'm a threat because I said cuss words and I'm asking her why. Like she's treating people differently. Like I don't, I don't understand this" Fake victim backs out of the parking spot, mind you I'm standing next to the officer and her police dog this entire time. Carrie says And here we are because I'm a threat because I cussed Someone tell me how I fucking threatened and harassed an elected…

(**Jones** interrupting): And that's your warning Carrie.

**Schmidt**: …government official based I just read? I want to know if anyone involved in the writing of the ban letter ever thought to ask me what happened or check the officer Bishop's body cam before writing the bullshit letter…

(**Jones** interrupting): Kay

**Schmidt**: … or did officer Bishop conveniently not have her camera on because she's trying to hide the fucking truth? So the fake vi….

(Ms. Schmidt's Webex connection is disconnected with 6 seconds left on her allotted 3 minutes)

**199.** Mr. Eravi appeared by Webex during his allotted three minutes with the following dialogue:

**Eravi**: Tried to unmute, are you doing Carrie or Michael?
**Jones**: It's ah, you're free to speak
**Eravi**: Am I?
**Jones**: Can you restart his time
**Eravi**: Am I free to speak?
**Jones**: Just a minute, there you go. Go ahead
**Eravi**: So you, you said there that I was free to speak. I really question what that means. Are you able to clarify that at all? I mean, what I saw just a minute ago was uncensored speech. Did you really let Justin say those words? You know, talking about the FUCAM petition and talking about another speaker that used the word bitch? Have you finally climbed down off your fucking high horse
**Jones**: Ok, that's your warning.
**Eravi**: Oh! So, certain usage does get a warning still. Thank you Kelly, I just wanted to clarify where we stood there. Since you spent the first 20, meh, 15-20 minutes praising yourself tonight
**Jones**: Agreed
**Eravi**: I couldn't, I couldn't see how that was gonna be uh, what are you agreeing on? Pause my time. That was an interruption, please pause my time
**Jones**: It's fine, pause it, and give him back 5 seconds
**Eravi**: What was that interruption? You were agreeing on something. What was that interruption?
**Eravi**: Pause my time. The way you run this meeting is incredible Kelly Jones. Since you spent the first 20 minutes of this meeting praising yourself and taking all kinds of accolades, I want to make sure that everyone on that board, as well as your school board president is aware of the words you said to me.
                    (playing a recording)
**Eravi**: Fancy seeing you guys here. You think you're going to have the police like, arrest me today Kelly? No? You don't think so here?
**Jones**: I actually, I wish you well
**Eravi**: But you are thinking you're gonna get away with it at the school district?
**Jones**: I, If you're not treating somebody
**Eravi**: You realize you're violating the law at the school district? Banning people for free speech
**Jones**: I don't want to ban anybody for free speech. I definitely want you to be able to give your, your point of view
**Eravi**: How about you lift the ban and let me come back into the school meeting?
**Jones**: How about you talk the way you should in front of a five year old? I actually, there's things…
**Eravi**: How about I can say the word "fuck" anytime I want Kelly?
**Jones**: Ok, you can, you definitely can here

78

**Eravi**: And I can say it inside that school district office too
**Jones**: Ok
**Eravi**: So why are you kicking me out? Why are you using police to express your feelings?
**Jones**: I definitely didn't kick you out for that reason
**Eravi**: What reason did you use then?
**Jones**: You got a letter
**Eravi**: I got a letter
**Jones**: You did
**Eravi**: Ok, so now you're banning me for the free speech outside on public grounds
**Jones**: I, I'm glad you're here
**Eravi**: So now…
**Eravi**: As we can see here, as we can see here, there's nothing going on, that is anything that is anybody's problem or anything. But, yet, at the school district, you're gonna have police arrest me
**Jones**: That is not why we had the police arrest you
**Eravi**: It's your feelings Kelly, there was nothing, there was nothing. What am I doing here that is different than at the school district?
**Jones**: You're not doing anything different here than at the school, than, having a conversation ok
**Eravi**: Then why are the police, why aren't you having the police called…
<div align="center">(end of recording)</div>

**Eravi**: You aren't doing anything different than at the school district other than having a conversation with me. Those are your words, Kelly. Dr. Swift, your fucking ban needs to be lifted.
**Jones**: Ok, that's it, that's, that's it (connection prematurely disconnected)

**200.** The June 23, 2025, meeting illustrates yet again the defendants' arbitrary enforcement of their own rules and policies. Dr. Spiehs was silenced for referencing his petition acronym, Ms. Schmidt was muted and disconnected for recounting the verbatim exchange that defendants had already relied on in her ban letter, and Mr. Eravi was cut off after exposing contradictions in Jones's own words about why he was excluded. At each turn, speech was curtailed not because of any actual disruption but because it criticized defendants, highlighted their double standards, or used words defendants disfavored. Such selective silencing is textbook viewpoint discrimination and violates the First Amendment.

**JULY 14, 2025 MEETING**

**201.** Dr. Spiehs appeared via Webex on June 14, 2025, at the Board's open meeting. During his allotted time he attempted to speak about the reappointment of defendant Ross, noting that Ross had been voted out by the electorate in 2021 but later reinstalled by the Board in 2022. Dr. Spiehs was interrupted mid-sentence when he used the phrase "dumb asses on the board," and Ross immediately issued a "warning." When Dr. Spiehs attempted to continue, Ross again cut him off, prematurely ended his comment period, and directed staff to disconnect him from the meeting before his three minutes expired;

> **Spiehs**: All right. So, earlier in the meeting here tonight, uh, GR Gordon Ross was voted in as president of the school board. And you know what's interesting about that is that GR was voted out by the community of Lawrence in November of 2021 and then these dumb asses on the board voted him back on the board…
> (**Ross** interrupting): Justin, that's your warning
> **Spiehs**: For what? For what? In August of uh anyways, I was I was interrupted right there. And so anyways, uh the dumb asses on the board voted him back on the board in August…
> (**Ross** interrupting): Okay Justin, we're going to move on to comment from Trisha
> **Spiehs**: …2022 after a board member resigned
>                    (Webex disconnected prior to three minute expiration)
> **Ross**: Trisha Massenthin, are you here? Fantastic. We'll have James turn the mic on for you

**202.** Defendant Ross's conduct demonstrates the same unconstitutional pattern practiced by the Board: censoring and terminating speakers who use sharp or vulgar language in criticizing the Board, while allowing uninterrupted speech when the language is used in praise or non-critical commentary. The premature disconnection of Dr. Spiehs for calling the Board "dumb asses" was viewpoint discrimination, as the Board has repeatedly permitted other speakers to use terms such as "bitchin'" or to

praise staff with emotional or exaggerated language without warning or removal. By contrast, when directed at Board members in criticism, the same or lesser language triggers immediate censorship.

**203.** The censorship of Dr. Spiehs's comments for using the term "dumb asses" mirrors the unconstitutional restraint struck down in *Cohen*  In *Cohen*, the Supreme Court held that the use of the word "fuck" on a jacket in a courthouse was not obscene, threatening, or disruptive, but rather a protected expression of political opinion. The Court emphasized that "one man's vulgarity is another's lyric" and that the state cannot sanitize public debate by punishing speakers simply because their words offend some listeners. Here, Dr. Spiehs's criticism of the Board's decision-making, even if couched in vulgar language, was plainly core political speech addressing elected officials. Defendants' suppression of that expression is precisely the kind of unconstitutional viewpoint-based restriction the First Amendment forbids.

### JULY 28, 2025 MEETING

**204.** On July 28, 2025, Dr. Spiehs again appeared via Webex during general public comment. He began by highlighting that he had been removed from the prior meeting for saying "dumb asses" twice, noting that another speaker had previously said the same word and even worn it on a shirt without censure. He directly asked whether this unequal treatment constituted viewpoint discrimination or retaliation under the First Amendment and unequal protection under the Fourteenth Amendment. Dr. Spiehs pointed out the inconsistency of allowing words to be spelled or displayed in writing but not spoken aloud. He further criticized the Board's decision-making and

leadership, including its rehiring of a previously defeated board member, and connected the censorship of his language to the Board's misplaced priorities compared to its responsibility to protect students. When Dr. Spiehs began discussing his "Fully Uncensored Communications At Meetings" (F.U.C.A.M.) petition, defendants Ross and others cut him off before the conclusion of his three minutes, even though his petition addressed the very constitutional issue at stake:

**Spiehs**: Hey, uh, Raggedy Anne Costello, I see your mute button is working this meeting. Remember that meeting when you called me Crazy Justin Spiehs on your microphone? I remember. Last meeting I was removed from the meeting by Gordon Ross as I spoke during general public comment for saying a naughty word and the word was d-u-m-b-a-s-s-e-s. And even worse, I said it twice. Oh no. But a speaker at a previous meeting wore a shirt that said the word d-u-m-b-a-s-s and he also said the naughty word d-u-m-b-a-s-s but I can't? Is that unequal protection under the 14th amendment of the United States Constitution? Is that retaliation against me? Is it viewpoint discrimination? Seems like it. But if I can spell naughty words here at the meetings and people can wear naughty words on their clothes, then why can't I say these same words? You say it's because students may be listening to the meetings, but are you saying they don't know how to spell? You're the school board. Are you saying your students can't spell? It's a lame excuse. It's called free speech, guys. And what I was going to say last meeting before being removed by Gordon Ross for saying naughty words was that last meeting Gordon Ross was voted president of this school board. But people might not remember that Gordon was voted out of his school board position during the November 2021 election. And then these idiots on the school board voted him back on the board in August of 2022 after a board member resigned. Now you're president. A guy the community no longer wanted on the board is now running the board. He's unelected and is now running the board. And so with leadership and decision makers like that on this board, it's no wonder you all hired a teacher that raped students in your schools. You're foolishly more worried about adults saying naughty words here during the meetings than you are for properly vetting teachers to make sure you aren't hiring child sexual predators. Get it together, guys. Have some perspective. I want to talk about my Fully Uncensored Communications At Meeting petition that I'd like for you guys to consider signing. And that acronym is F.U.C.A.M. and it's pronounced fuck am…
(**Ross** interrupting): That's your warning, Justin
**Spiehs**: Well, Gordon, F-U-C-A-M is not a naughty word. That's uh F-U-C-A-M. It's pronounced fuck am…
(**Ross** interrupting): Thank you, Justin, for joining us this evening

(Webex disconnected prior to three minute expiration)
**Ross**: All right, so we're going to move on to Carrie

**205.** On the same date, Ms. Schmidt also appeared via Webex to address her treatment by the Board. She recounted how her brief questioning of President Jones in the parking lot had been mischaracterized as threatening and used as a basis for a permanent no-trespass order. Ms. Schmidt contrasted her calm parking lot encounter with ordinary daily interactions at public places like Walmart, where no one accused her of harassment. She argued that her speech was protected, that she had posed no threat while standing near armed officers, and that the ban was retaliatory and grounded in falsehoods. Ms. Schmidt also criticized the Board's silencing of dissent while Lawrence schools faced serious problems such as absenteeism and declining enrollment. When she quoted former President Trump's statement that officials "don't know what the fuck they're doing," she was immediately warned and then cut off before completing her three minutes. This again illustrates the Board's pattern of selectively censoring disfavored viewpoints under the guise of regulating "inappropriate" language, while celebrating praise and permitting other speakers to use similar words without sanction:

**Schmidt**: You know, this weekend the craziest thing happened to me. I was in Walmart, and I walked up to an employee and asked them a question. They let me ask them a question and they    didn't interrupt or tell me that they were going to trespass me. Then, wildly enough as I walked back to my car a woman and her son, who I didn't know, approached me in the parking lot and asked me for money. I kindly answered her with "no thank you" and got in my car and drove away. It's crazy how people communicate these days by asking each other questions…unless, you are Ms. Kelly Jones, whom after my last speech, we all know as the Fake Victim. The Fake Victim, campaigned to work for "We The People," yet doesn't let you ask her questions in a parking lot, even when Officer Bishop and her police dog is present. The Fake Victim lies about her interactions with people who don't agree

with her choices and gets her bestie, Miss Superintendent, to entertain and cosign her lies by trespassing people from public property when they have not broken a law. I was not threatening or harassing by trying to ask a question of an elected official. If I was, I am sure Officer Bishop and her police dog wouldn't have ignored me, by turning their back on me, to walk upstairs and back into the building. My ONLY crime is calling out these lying board members, along with Miss Superintendent and fighting for freedom of speech. I guess the Constitution doesn't apply when it comes to USD497's board room, yet in the district libraries anything goes. To the community, this school board needs to be spending time figuring out real issues verses silencing people. They sit up there and pat themselves on the back during every meeting when school absences in Lawrence have gone up 82% to the point where the average student misses more than 3 weeks of school in a year. USD497 has lost 3 times more students than any district within the Topeka to the Kansas City commuter corridor, equaling out to be approximately 1,600 students, all while the population of Lawrence has grown every year. But they lie to your face and tell you that it is due to birth rates being low and how there isn't enough affordable housing. Vote Kelly Jones, AKS The Fake Victim and Shannon Kimball out in November, because like President Trump once said quote, They don't know what the fuck they're doing End…

(Ross interrupting): That's your warning Carrie

Schmidt: … quote. This board is full of hypocrites who provide the same words to minors that I have said in here and been removed. I have told the truth about how their policy is bullshit…

(Ross interrupting): Thank you Carrie for joining us this evening

Schmidt: and unconstitutional. Like former Pres…

(Webex connection severed before expiration of Ms. Schmidt's allocated 3 minutes)

**206.** The July 28, 2025, censorship of both Dr. Spiehs and Ms. Schmidt again demonstrates the Board's unconstitutional suppression of disfavored viewpoints under *Cohen*. Here, Dr. Spiehs was silenced for saying "dumb asses" and for advocating his "Fully Uncensored Communications At Meetings" petition (F.U.C.A.M.), while Ms. Schmidt was silenced for quoting President Trump's remark that officials "don't know what the fuck they're doing." Neither instance involved threats, true obscenity, or disruption; instead, both represented political commentary squarely protected by the First Amendment. The Board's actions therefore constitute

impermissible viewpoint discrimination and prior restraint, reinforcing the pattern of unconstitutional conduct repeatedly displayed at these meetings.

**207.** The Board's repeated practice of cutting off speakers mid-comment, muting microphones, or terminating Webex connections is not a valid time, place, and manner restriction under First Amendment jurisprudence. Content-neutral regulations must be narrowly tailored to serve a significant governmental interest while leaving open ample alternative channels for communication. *See Ward v. Rock Against Racism*, 491 U.S. 781 (1989). The Board's interruptions are neither content-neutral nor narrowly tailored: they consistently occur only when speakers criticize the Board or use words the Board disfavors, such as "bullshit," "dumb asses," or "fuck," while other speakers using similar or harsher language are permitted to continue without interruption. This selective enforcement demonstrates viewpoint discrimination masquerading as decorum enforcement, violating the First Amendment.

**208.** The Board's speech policy, as applied, is unconstitutionally vague and overbroad. Speakers are never provided a list of prohibited words or clear standards of what constitutes "foul," "inappropriate," or "obscene" language. Instead, speakers are silenced arbitrarily depending on the presiding officer's subjective judgment and disfavor of the viewpoint expressed. Such vague restrictions chill lawful speech because citizens cannot reasonably predict which words or criticisms will trigger removal, while overbroad enforcement sweeps in core political expression entitled to the highest protection under the First Amendment.

AUGUST 11, 2025 MEETING

**209.** Mr. Eravi spoke via Webex on August 11, 2025, at the Board open meeting.

**210.** When a participant is admitted to the Webex connection, the individual can now hear the meeting in progress. However, in January and February 2025, this was not the case; speakers waited in silence until unmuted by the Board. Even now, while waiting, the microphone remains controlled by the Board, and the speaker's screen may display a countdown timer, as occurred with Mr. Eravi. The individual waits to speak on Webex the microphone is muted by the Board and sometimes a timer appears as below as with Mr. Eravi:



**211.** The following dialogue took place at the meeting:

**Eravi**: How many times am I gonna to unmute? Can ya'll hear me?
**Ross** Yes
**Eravi**: K, I unmute and you guys mute me again. What's that all about? Just gonna start the time, ok. To hell with it, it doesn't matter. Got a lag from the uh host now, where's the host at? I can't see the board anymore. We just shut down the video there? How come it's lagging? Can you guys not run your web shit correctly?

**Ross**: That's your warning Michael
**Eravi**: oh! Gordon, is that you? Gordon, is that you giving me a warning? So you wanna get mixed up in this too? Your tyrannical bullshit isn't gonna work buddy
**Ross**: Here we go, thanks for coming Michael. alright, we're gonna move on
**Eravi**: So you're just gonna shut me off huh?
                    (Webex disconnected prior to three minute expiration)

212. Ms. Schmidt then appeared via Webex and delivered remarks concerning district policy and the disparity between language prohibited at board meetings versus language available in district library books. After reading passages from Alice Sebold's Lucky – a book available to district students – she was cut off by Ross before her three minutes expired:

**Schmidt**: Yesterday there was a post on X about this school district that was pretty alarming. It even got the attention of Harmeet Dhillon, who is the Assistant Attorney General to Pam Bondi. She used one word when she retweeted the post and that word is problematic. This X post that has been seen by over half a million people was about your LGBTQ Advisory Guide. The post stated QUOTE Kansas school district @usd497 advises that kids can use the locker room and be on sport's teams that correspond with their gender identity instead of their s*x. This is a direct violation of Kansas law and Trump's EOs. END QUOTE I want to know why you aren't following the Law when it comes to men in women's spaces and activities? I would also like to know if you still are disciplining up to termination your faculty, staff, and even substitutes for not using preferred pronouns of students? A reoccurring theme with this district is you don't follow the law. Maybe you all should stop being problematic, then you wouldn't have so many issues. So, moving along…

Lucky by Alice Sebold is a disturbing book that is in your school district for adolescents to read. It is available for those precious children, you are so called protecting from hearing foul and obscene language at these board meetings. To everyone listening know that what I am about to read is what this board of education and superintendent believe is appropriate for the students of this district to be exposed to, but they have deemed adults saying a cuss word during public comment as a crime

He lay down on top of me and started humping. …He worked away on me, reaching down to work with his penis. I stared right into his eyes. I was too afraid not to. He called me bitch. He told me I was dry. I'm sorry," I said- I'm a virgin. He began to

knead his fist against the opening of my vagina. Inserted his fingers into it, three or four at a time. Something tore. I began to bleed there. It was wet now. It made him excited. He was intrigued. As he worked his whole fist up into my vagina and pumped it, I went into my brain. He grabbed my breasts. He twisted the nipples with his fingers, lapped at them with his tongue.

Give me a blow job he said. I want a blow job. He held his dick in his hand. Put it in your mouth. I kneeled before him. He grabbed my head. Put it in your mouth and suck he said. I took it in my hand. He shoved my head forward and I put it in. It touched my tongue. The taste like dirty rubber or burnt hair. I sucked in hard. Not like that he said and brought my head away. Don't you know how to suck a dick?  No, I told you, I said. I've never done this before. Bitch he said. His penis still limp, he held it with two fingers and peed on me

The book Lucky says bitch 6 times, it says…

(**Ross** interrupting): That's your warning...

**Schmidt**: …fuck 7 times…

(**Ross** interrupting): Thank you Carrie for coming

**Schmidt**: …it says shit 3 times, yet you provide…

                     (Webex disconnected before 3 minutes expired)

**Ross**: Alright we'll go with Justin

**213.** When the Webex connection is terminated prematurely, the speaker is shown a standardized "disconnected" screen image, abruptly ending their participation without acknowledgment that their speaking time had not concluded.

**214.** Dr. Spiehs next spoke via Webex, criticizing Board members' hypocrisy and continuing his advocacy for his "Fully Uncensored Communications At Meetings" petition. As soon as he referenced the petition by its acronym "F.U.C.A.M.," Ross issued him a warning. Spiehs explained that the very point of his petition was to illustrate arbitrary censorship at Board meetings and noted he had renamed it "Please Hear Us Communicating Our Messages 2," or "PHUCOM 2," pronounced "fuck am 2." Before he could finish his remarks, Ross disconnected his Webex prior to the expiration of his allotted time:

**Ross**: All right, we'll go with Justin

88

**Spiehs**: Can you hear me?

**Ross**: Yep

**Spiehs**: All right, so it sounds like your guys' COVID policies are the reason your enrollment numbers are down and declining. I tried telling you morons this would happen during Covid, but you and this entire community just dismissed me as a crazy person. Ain't that right, Aggedy, Raggedy Anne Costello? And speaking of morons, Gordon, you misgendered someone? Man, that's a big one. Does that make you a transphobe? I think that you, as a privileged white male who doesn't understand gender because of your cisgender, white, heteronormative male lived experience, that you should resign right here tonight for misgendering that person. And I think your fellow progressive feminist board members should also demand you resign as well. According to your school district's uh own policy, staff can be uh terminated for misgendering. By the way, is that policy legal? It doesn't seem like it. So, I want to talk to you guys about a petition I started uh that I want you guys to consider signing because the petition could help educate people on their First Amendment rights when speaking here at your meetings because you guys have repeatedly removed me and two others as we saw here just tonight uh strictly due to the words we speak during your general public comment. The name of my petition is the Fully Uncensored Communications At Meetings petition and the acronym is F-U-C-A-M and is pronounced fuck am…

(Ross interrupting): That's your warning, Justin

**Spiehs**: Well, Gordon, that's exactly what I want to talk about here this evening. So, every time I have said the name of my petition while speaking here during the meetings, I get warned and removed as we just saw right there. So, I went ahead and renamed my petition and the new name for my petition is Please Hear Us Communicating Our Messages and it has the number two right after it indicating this is the second edition or a renaming of the petition. So, that new acronym is P-H-U-C-O-M 2 and that is pronounced fuck am 2…

(**Ross** interrupting): All right. Thank you, Justin

**Spiehs**: …and so. Well, hold on. That…

(Webex connection disconnected before time expired)

**215.** The August 11, 2025, events once again demonstrate the unconstitutional pattern of viewpoint discrimination, retaliation, and arbitrary enforcement of undefined speech restrictions. Mr. Eravi was disconnected after questioning the Board's control of the Webex system and criticizing President Ross. Ms. Schmidt was cut off while exposing the double standard between so-called "foul language" prohibited at meetings and the same or worse language permitted in district libraries. Dr. Spiehs was disconnected for nothing more than articulating the title and acronym

of his petition – itself a protest against censorship. In each case, the Board did not act to preserve order or decorum but to silence disfavored viewpoints critical of Board members and administrators. This disparate treatment further establishes that Defendants' actions were not content-neutral time, place, or manner restrictions, but instead targeted, viewpoint-based suppression of protected speech in violation of the First and Fourteenth Amendments.

<div align="center">

**AUGUST 25, 2025 MEETING**

</div>

**216.** Mr. Eravi spoke via Webex on August 25, 2025, at the Board open meeting with the following dialogue:

> **Ross**: We'll start with Michael. Michael, are you there?
> **Eravi**: Hello. It would be nice if I was able to be heard
> **Ross**: We can hear you
> **Eravi**: You wouldn't believe the kind of stuff we have to go through to get audible on your Webex. It's nice to see you guys acknowledging the fact that money is an issue. It's too bad that you and the, the teachers you've hired will end up costing us so much more. But I digress. Uh, your superintendent sent me an email after I had registered for public comment. I hadn't really uh seen the superintendent butt into those standard emails before, but she sent me an email and part of what she said was also, I'm advising you tonight, we will have students joining the meeting in the Webex room who will be speaking about their student experience in the district. I am requesting that you please refrain from creating a harassing environment there for them by writing inappropriate messages in the chat. So, uh, you know, I got to thinking about that email after she sent it to me and, and you know, the questions that came to mind were inappropriate, harassing. So I asked her, You mean like books in the district that describe fisting a teenage female's vagina while she's on her menstrual cycle? And I told her, I could remain well within that threshold set by you and the district. But you know, my real question to her is, which students are you trying to protect? Is it the elementary students that this district gave to Mark Gridley to abuse? Or is it the middle school and junior high kids that Patrick Naughton was placed with again, by this school district? Maybe it was Nick Burgoon, you know, the first of these three that you knew about. The one you let quietly go away so he could, you know, end up in charge of children in another school. It's obvious that Baker University had little knowledge of this when they hired him given the speed in which he left. This is the fucking problem with you people…

<div align="center">

90

</div>

(**Ross** interrupting Eravi): …that's your warning, Michael
**Eravi**: …you want to have the false narratives carry the fucking day
(**Ross** interrupting) …thank you
**Eravi**: …ss long as I'm alive in this town, that will not fucking happen
     (Eravi removed from Webex before time expired)
**Ross**: We'll move on to Justin

**217.** Dr. Spiehs spoke via Webex on August 25, 2025, at the Board open meeting with

the following dialogue:

**Ross**: We're going to move on to Justin
**Dr. Justin Spiehs**: Can you hear me?
**Ross**: Yes
**Spiehs**: All right. My name is Dr. Justin Spiehs. You guys have an unconstitutional speaking policy here during your meetings that says no foul language can be used while speaking during public comment. And we saw that in action just right there when you removed Michael. But last meeting, you allowed a book from your school district libraries to be read that graphically and inappropriately described an obscene sex act that is disgustingly called fisting. I can't think of anything more foul and obscene than what was read last meeting from that book that again is available to your students in your school district libraries. You repeatedly remove me and Michael and Carrie for saying cuss words here during public comment because you say students might be listening and in attendance so you therefore claim you need to protect their ears from foul language. But if that really is the case, if that really is your reason, then why do you allow books about fisting in your school libraries? And why did you allow that book about fisting to be read here during public comment? How do you square that circle? How could you possibly justify that? But since you do allow books to be read here without removing speakers, I want to read from a book I came across. It goes: Jay-Hopp and Donnie flew down the side street every now and then, looking back for the pursuing patrol cars that alerted the neighborhood to their to their presence. Fuck, they see us, Jay-Hopp shouted. Fuck those pigs, man. Keep going, Donnie said back. Just ahead, a second patrol car turned onto the side street, preventing the fugitives from fleeing any further. Now fully aware their run was over, Jay-Hopp and Donnie put their hands up. Jumping out of the patrol car, the officer screamed, You're under arrest by the authority of that bitch Kelly Jones and that dipshit Gordon Ross. The End
**Ross**: Thank you, Justin
**Spiehs**: I made that story up. So, since it's not an actual book…
**Ross**: We'll go to Carrie
(Spiehs' Webex feed is terminated prior to his 3 minutes of allotted speaking time)

**218.** Ms. Schmidt spoke via Webex on August 25, 2025, at the Board open meeting

with the following dialogue:

**Schmidt**: Okay, Alright. Board members, I have a question for you tonight after I read from two Colleen Hoover books, so please listen closely to its content. People at home know that this content is sexually explicit and contains words that this board deems obscene if anyone were to say it outside from reading it from the book. The first book I am reading from is titled Maybe Not.

I reach down to her thighs and spread her legs with my hand. I keep my eyes focused on her anyway as I slowly push two fingers inside of her, waiting for her to moan into her pillow. She doesn't make a sound, so I pull them out and re-enter her with three fingers this time. She pulls at my hair and spreads her legs for me, wanting me to bury myself inside of her. I do. I push her panties aside and shove into her so hard and fast, she lets out a moan. I take one of her breasts in my hands and bring it to my mouth. I slowly kiss my way down her stomach. Fuck woman. I smile triumphantly and press my lips to her stomach again. I start just below her belly button and trail slow kisses all the way down until I meet her panties. I hook my fingers into the waistband and pull them down. I lift her leg and press a soft kiss against her ankle, then her calf, then the inside of her knee, repeating the kisses all the way up her thigh. My tongue slides against her, separating her. My fingers find their way back inside of her. I'm filling her, consuming her with my tongue, and she's taking every ounce of me she can get. Now she's pressing my face into her, begging me to go faster. Her hands leave my hair and meet me, and meet her headboard as she grips it tightly and locks her legs around my shoulders. I keep my fingers buried inside of her as she cries out my name with each tremor that racks her body. I kiss the inside of her thighs as I pull my fingers out of her.

The next book I am going to read from is titled Two More Days

Instead of serving the populace, you're going to be serving my vagina. I could've really been bad and said pussy, rather than vagina. Stuart's hand left my breast and slid down my abdomen to unbutton my dress pants. When his hands dipped into the waistband of my panties, I sucked in a breath. As he slid his fingers against my clit, he said, Mm, you're soaked. Arching against his hand, I murmured, Please." "Please what? Make me come. Stuart's answer was to slip, not just one but two fingers deep inside me. As he pumped them in and out, I began frantically moving my hips. I panted and moaned as I worked toward coming. When Stuart pushed, um, in a third finger and swirled them to my G-spot, I came undone. Holy shit, Fuck yeah

Board Members, now on to my question I have for you. Which Colleen Hoover book that I just read from is in your district? As a hint, the book "Maybe Not" says ass 27 times, fuck 29 times, piss…

**Ross** interrupting): Thank you Carrie

**Schmidt**: …11 times and bitch 7 times. The book Two More….

(Schmidt's Webex feed is terminated prior to Schmidt's 3 minutes of allotted speaking time)

**219.** The August 25, 2025, meeting again reveals the Defendants' deliberate, viewpoint-based suppression of protected speech. Mr. Eravi was disconnected for criticizing the Board's failures to protect students from predatory teachers and for using profanity only in the course of that criticism. Dr. Spiehs was terminated mid-comment for illustrating the absurdity of the policy by contrasting library content with the language he was banned for. Ms. Schmidt was cut off while reading directly from books available to minors in the district's libraries – books containing explicit sexual content and profanity far beyond anything she had uttered in her own words. In each instance, Defendants allowed graphic or vulgar content when read as "approved" curriculum material but silenced citizens when they used similar words to criticize the Board's actions. This stark inconsistency underscores the unconstitutional viewpoint discrimination at the heart of Defendants' policies and actions.

### THE PARTIES

**220.** Plaintiff Justin Spiehs is a resident of the state of Kansas also residing in Johnson County, Kansas.

**221.** Kelly Jones, was a Board President and current USD 497 member of the Board of Education the Lawrence Kansas School District. Defendant Jones is sued in her individual capacity.

**222.** Ronald Gordon-Ross is the Board President and current USD 497 member of the Board of Education the Lawrence Kansas School District. Defendant Ross is sued in her individual capacity.

**223.** Jeanice Swift is a natural person who was hired by the Board of Education for the Lawrence Kansas School District as Superintendent of Schools for Lawrence USD 497 School District. She is sued in her  individual capacity.

**224.**  Unified School District No. 497, Douglas County, Kansas (USD 497). USD 497 is a school district in Douglas County, Kansas.

<div align="center">

**FIRST CAUSE OF ACTION**
**KANSAS PRESERVATION OF RELIGIOUS FREEDOM ACT AGAINST USD497, KELLY JONES, RONALD GORDON-ROSS,  AND JEANINE SWIFT**

</div>

**225.** Plaintiff restates and incorporates by reference the allegations in the above paragraphs.

**226.** Liberty Memorial Central Middle School is located on USD 497 property.  Free City Church leases that school to conduct church services.

**227.** Dr. Spiehs has requested permission from the defendants to attend Free City Church on USD 497 property for church services occurring in April 2025 including its Easter service.  Free City Church says they welcome everyone including even Dr. Spiehs on its website.   https://www.fcclawrence.com/learn  It states "If you're new to our church or considering a visit, we would love to welcome you."

**228.** People attending Free City Church are not required to request permission from USD 497 to attend or visit Free City Church services.

**229.** Free City Church will have a Friday, April 18, 2025, Good Friday service which Dr. Spiehs would like to attend.  https://www.fcclawrence.com/events/good-friday

**230.** Dr. Spiehs has contacted Free City Church to see if he is welcome to visit or attend and behold – Free City Church has responded in the affirmative that even Dr. Spiehs is welcome!

**231.** On March 31, 2025, Dr. Spiehs emailed Dr. Jeanice Swift at jeanice.swift@usd497.org stating "I'd like to attend the Free City Church service held Sunday at 10:30am at Liberty Memorial Central Middle School. Please let me know if I am able to attend it."

**232.** The fact that the defendants have the authority and discretion to grant permission for Dr. Spiehs to do any or all of the prohibited acts under the Lewis ban – and have exercised that discretion in denying Dr. Spiehs his repeated requests for the defendants to exercise that discretion each remain a "discrete act." *Vasquez v. Davis,* 882 F.3d 1270, 1277 (10th Cir. 2018). Each time the defendants refuse to exercise that discretion they are still relying on the policies that give each that discretion.

**233.** Church services are conducted on USD497 property.

**234.** The fact that Dr. Spiehs can or must request permission for defendants to exercise their discretion implicates a protected liberty interest. *See Schmidt v Huff,* No. 25-CV-2081-EFM-GEB 2025 WL 901335 (Kan.D. 3/25/2025) at \*4 ("Although Plaintiff has been granted permission to attend these events, the mere fact that he must obtain permission when other similarly situated members of the public do not is a deprivation of liberty. Defendants cannot strip Plaintiff's rights down to privileges without just cause. Here, Defendants have failed to show that Plaintiff

violated the law or the school's policies, and so they have no just cause on which to base their treatment.

**235.** Defendants' prohibition of Dr. Spiehs from attending Free City Church services on USD 497 property substantially burdens his sincere religious exercise, in violation of the Kansas Preservation of Religious Freedom Act, K.S.A. § 60-5301 *et seq*.

**236.** The KPRFA requires that any government action substantially burdening religious exercise must further a compelling governmental interest and be the least restrictive means of furthering that interest. Defendants cannot demonstrate a compelling interest in preventing Dr. Spiehs from attending Free City Church, especially where the church itself has publicly invited him to attend and has confirmed he is welcome.

**237.** Defendants' reliance on the so-called "Lewis ban" and related no-trespass orders to prohibit Dr. Spiehs from attending Free City Church services constitutes a continuing, discrete act of religious discrimination. Each refusal to lift or suspend the ban as applied to his attendance at worship services is an unlawful application of discretionary authority.

**238.** The refusal to allow Dr. Spiehs to attend worship at Free City Church is not narrowly tailored and is not the least restrictive means of achieving any legitimate government purpose. Less restrictive alternatives exist, including ordinary security measures already in place during services.

**239.** By preventing Dr. Spiehs from attending Easter services and other worship at Free City Church, Defendants have placed him in the untenable position of either

violating the no-trespass ban or foregoing his religious exercise, a burden the KPRFA prohibits.

**240.** On April 22, 2025, Ms. Schmidt emailed defendant Swift and asked "Free City Church has service on Sunday at 10:30 am at Liberty Memorial Central Middle School that I would like to attend. Please let me know if I have permission to attend it."

**241.** On April 25, 2025, defendant Swift emailed Ms. Schmidt stating "Based on the advise of legal counsel, your request to attend the service this Sunday, April 27, at Free City Church at Liberty Memorial Central Middle School has been approved. This authorization applies from the start of the church service to the end of the service and does not allow for access to any areas of the building or property other than those being used for the church service."

**242.** Ms. Schmidt and Dr. Spiehs are the only individuals that USD497 requires to ask permission to attend church on a USD497 property.

**243.** In the conditions set by Swift, it defined the contours of what "church" or Ms. Schmidt's religious exercise was or is in limiting Ms. Schmidt to "the start of the church service to the end of the service" as though the exercise of Ms. Schmidt's religion is only valid during that period – as opposed to fellowshipping before or after a "service," or volunteering before or after a "service."

**244.** This limitation violates First Amendment Establishment law as it establishes what government recognizes as a valid exercise of religion. The limitation does not recognizes the validity of religion extending to volunteering to set up or break down

before and after a "service" or even extending to mere fellowshipping before and after service.

245. So Ms. Schmidt emailed Swift asking "may I attend church this Sunday, May 3rd, 2025 and go early when they open the doors and stay late when they close the doors?"

246. Swift responded on May 1, 2025, that Ms. Schmidt could but that the same conditions applied: "all expectations remain the same as allowed in response to your previous request. The authorization applies from the start of the church service to the end of the service."

247. Ms. Schmidt would like the benefit USD497 provides all other individuals of attending church which includes time prior to and after "services" begin and end on USD497 property.

248. Ms. Schmidt seeks the benefit USD497 provides all other individuals of attending church, which includes times before and after "services" start and end on USD497 property and that without having to ask for prior written permission to do so.

249. In *Schmidt v Huff*, No. 25-CV-2081-EFM-GEB 2025 WL 901335 (Kan.D. 3/25/2025). Judge Melgren held that the Gardner School district's requirement to even ask permission was unconstitutional. Id at *4 ("Defendants unduly restricted Plaintiff's liberty by requiring that she obtain Defendants' permission to attend an activity or event that was otherwise open to the public").

**250.** Not only that USD497 contractually rents to churches to conduct religious activities on Sundays.  In those contracts USD497 contractually divests itself of prohibiting individuals from attending what is otherwise events open to the public.

**251.** USD497 has contractually opened its school property to the purposes of those who rent school space on the property on Sundays, including churches.  Once USD497 has opened its school property forum "the State must respect the lawful boundaries it has itself set." *Rosenberger v. Rector & Visitors of the Univ. of Va.,* 515 U.S. 819, 829 (1995.  In addition to time, place, and manner restrictions, the government may enforce content-based restrictions on speech, but only insofar as those restrictions "preserve the purposes of that limited forum." *Id.* at 830.

**252.** Churches rent USD497 school locations on Sunday and because of the defendants' ban directed at Dr. Spiehs, Dr. Spiehs is prohibited from associating with those parishioners, listening to messages, or in participating in those religious exercises.

**253.** Defendants' ban directed to Dr. Spiehs violates, much less does not preserve, the purpose of the church forums conducted on USD497 property on Sundays.

**254.** Dr. Spiehs has a First Amendment right to access USD 497 public property which in many cases is a designated public forum. *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1129 (10th Cir. 2012).  Regulations on speech in public and designated public forums require more exacting scrutiny. *Cole v. Goossen*, 402 F. Supp. 3d 992, 1013 (D. Kan. 2019).

**255.** Each day that defendants banned Dr. Spiehs from any physical presence on USD497 property, church attendance, or attendance at USD497 school board meetings that occur on USD497 property constituted a prior restraint on speech which was further evidence of retaliation because banning Dr. Spiehs from all USD497 buildings is not only unconstitutional, it is not reasonable or necessary.

**256.** Defendants do not have authority to ban Dr. Spiehs or Carrie Schmidt from personally attending church on USD497 property or in attending school board meetings. There is nothing in the School Board's participation policy that provides any Board member, much less defendant Jones or Swift, to prohibit anyone, including Dr. Justin Spiehs and Carrie Schmidt, from attending an open meeting conducted by the School Board – or for that matter attending a church service on Sunday located at a USD497 school building.

**257.** The defendants issue "warnings" to Dr. Spiehs during his speech which burdens his religious exercise because those warnings are punitive and based upon his religious speech and coerce Dr. Spiehs to self-censor and not exercise his religious beliefs.

**258.** The defendants USD497, Jones, Ross, and Swift have created a permit speech zone scheme, policy, custom, and practice, concerning entering onto USD497 property which has directly and indirectly constrained, inhibited, curtailed and denied the plaintiff's exercise of religion as defined under the KPRFA. Dr. Spiehs has a strong First Amendment liberty interest not only in access to church but the school board's open public meetings.

**259.** The defendants respective actions in punishing Dr. Spiehs for repeating words and phrases verbatim from USD497 library books is not only viewpoint discrimination but evidences a common goal of humiliating Dr. Spiehs because of his protected speech and then to require him to ask permission to do what other individuals and parents are not required to do in attending board meetings or church – all of which occur on USD497 property.

**260.** Dr. Spiehs has a spiritual belief and religious duty to speak to and about the literature being exposed to minors at schools including USD497. This spiritual mission includes speaking to the USD497 Board about that literature. Defendants Jones and Ross have stopped Dr. Spiehs's religious exercise in having him censored and removed from public comments during open meetings. Defendant Swift's trespass ban has similarly done the same thing including requiring Dr. Spiehs to ask permission to attend church services then limiting his participation in those church activities.

**261.** The Founding generation recognized the importance of public advocacy and embedded protections for public religious expression in state constitutions and the First Amendment.

**262.** The KPRFA, which incorporates the First Amendment's protection of public preaching, safeguards Dr. Spiehs's preaching and advocacy as a tool of protest and reform.

**263.** There is no evidence that Dr. Spiehs ever breached the peace or disrupted any meeting during his permitted 3 minutes of speaking time. Yet relying upon the

custom, practices, and policies of USD497, Kelly, Ross, and Swift, the defendants have separated Dr. Spiehs from his intended audience through their intimidation, discrimination, threats of arrest, and banishment from all USD497 property.

264. Dr. Spiehs does not claim to be perfect or without sin his faith has caused a great amount of zeal to fight evil and express objective truth. This ban made pursuant to the prior Policy burdens his religion as defined under the KPRFA as he believes it is his God-given mission as a Christian to advocate for children and against the pornographic depictions and literature to minors in school.

265. Dr. Spiehs seeks not only damages but forward-looking relief in an injunction allowing him to exercise his religious liberty and share his faith. That right is doubly protected by the First Amendment's free exercise and free speech clauses. The constitutional right to share one's faith is no accident. Government suppression of speech is commonly directed precisely at religious speech.

266. The KPRFA defines "burden" in part as "withholding benefits" and withholding "access to governmental facilities." Because of his religious exercise, the defendants have caused Dr. Spiehs to have the benefit of assembly, petitioning government, the right to speak on public property withheld as well as each causing Dr. Spiehs to be denied access to all of the governmental facilities located on USD497 property.

267. The KPRFA also incorporates the Religion Clause of the First Amendment which protects Dr. Spiehs' power to decide for himself free from state interference, matters of internal government as well as those of faith and doctrine.

**268.** Dr. Spiehs is faced with a Hobson's Choice of either remaining true to his religious convictions and be denied access to school board meetings and USD497 property or acting contrary to those religious convictions in order to obtain the benefits of church, public speaking, and personal attendance at board meetings.

**269.** The actions, policies, customs and practices of these defendants, as applied to the plaintiff, both directly and indirectly, constrains, inhibits, curtails and denies his respective practices or observance of religion under section 7 of the bill of rights of the constitution of the state of Kansas.

**270.** The defendants respective actions of silencing, censuring, and banning Dr. Spiehs because he quoted language from school books, said "shitty" "fuck," "bitch" or whatever the amorphous word group Swift was referring to in "foul language" Dr. Spiehs's actions were because of exercising his religious beliefs and requires him to act or refuse to act in a manner substantially motivated by a sincerely-held religious tenet or belief, whether or not the exercise is compulsory or a central part or requirement of his respective religious tenets or beliefs.

**271.** The defendants respective actions of silencing, censuring, and banning Dr. Spiehs because he was purportedly "disrespectful" because of exercising his religious beliefs requires him to act or refuse to act in a manner substantially motivated by a sincerely-held religious tenet or belief, whether or not the exercise is compulsory or a central part or requirement of his respective religious tenets or beliefs.

**272.** That the interests of making individuals be "respectful" in some undefined way, or not permitting "foul" language – whatever that word could possibly encompass, or

in "requesting" (as opposed to not asking but ordering) individuals to leave because of being "disrespectful" or using "foul" language that minors read in their library books is not a significant government interest and certainly not one of the "highest order and not otherwise served."

273. There is no clear and convincing evidence that the defendants speech/behavior code articulated by defendant Swift in her letter furthers any compelling governmental interest, as applied to the plaintiff or that those actions, orders, and policies are the least restrictive means of furthering any compelling governmental interest as applied to this plaintiff.

274. The plaintiff has no adequate remedy at law to prevent the continuing violation of his KPRFA rights, his Kansas Bill of Rights and his First Amendment rights under the U.S. Constitution as referenced in the KPRFA.

275. The plaintiff has been damaged and is entitled to all categories of relief set forth in the KPRFA.

## SECOND CAUSE OF ACTION
### (NOTICE AND OPPORTUNITY TO BE HEARD)
### VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE U.S. CONSTITUTION AGAINST ALL DEFENDANTS
### (42 U.S.C. § 1983)

276. Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

277. These presiding board members have failed to follow fair procedures when depriving Plaintiff of his protected liberty interest in expressive activity and religious

exercise, and his property interest in access to public meetings and facilities that Kansas law designates as open to the public.

**278.** If a government policy fails to provide the kind of notice that will enable a person of ordinary intelligence a reasonable opportunity to know what is prohibited, such policy is void for vagueness in violation of the Due Process Clause of the Fourteenth Amendment,

**279.** "Warnings" declared by a presiding board member are deceptive and punitive. They are punitive because they are viewpoint based and discriminatory. They are given because of the plaintiff's protected expressive speech and conduct. These warnings are a pretext for suppression of the plaintiff's speech protected by the First Amendment.

**280.** The warnings are coercive and punitive because a second "warning" results in the harsh treatment of not only loss of speaking time but ejection from the meeting, then the entire building.  Thus, each warning is merely a scattergun exercise implicating all speech rules.  As such each warning does not inform the speaker what policy, if any, was violated and how, the plaintiff either self-censors or has to guess as to what the claimed violation was factually based upon or how it violated any speech rule.

**281.** These presiding board members have failed to follow fair procedures when attempting to, and in fact do deprive, the plaintiff's liberty and property interests.

**282.** Warnings are misleading, coercive, and deceptive because when a presiding board member gave a "warning" there was no explanation as to what policy, if any,

was purportedly violated.  Dr. Spiehs was left in the dark as to how his speech or conduct that was being "warned" about violated any rule or policy and as such denied Dr. Spiehs due process in understanding or in modifying his speech or conduct.

**283.** Thus these purported "warnings" denied the plaintiff of information regarding the presiding board members charge or asserted violation and denied the plaintiff an opportunity to present his side of the story or challenge the accusation.

**284.** The terms "bullying," "complaint," "disrespectful" and "foul language" as the Board policy's prohibitions violate the First Amendment both facially and as applied, the prohibition on disrespectful and foul language is unconstitutional as applied, and all prohibitions are void for vagueness.

**285.** Due to the presence of law enforcement officers in the meeting room and a presiding board member or Superintendent practice of directing, commissioning, or ordering speakers from not only the meeting but the building with police assistance, the plaintiff could reasonably believe each defendant could retaliate against him with criminal sanctions is he does not comply with those directives.

**286.** None of the words spoken by Dr. Spiehs are "obscene" as defined by Kansas law. Defendants are applying "obscenity" speech to common profanity or formal biological terms.

**287.** These regulations are against offensive speech which is viewpoint discrimination.

**288.** Defendants cannot interrupt, silence, or expel speakers voicing purportedly offensive speech from its school board meetings by labeling it a "complaint,"

"disrespectful," or by misapplying a legal prohibition on "foul" speech to school library books or formal biological terms. And individuals cannot silence each other in a public forum by taking offense. The First Amendment does not allow a heckler's veto.

**289.** A purported "complaint" only concerns negative speech while permitting positive speech on the same subject or about the same person. It is viewpoint discriminatory. These prohibitions are an ongoing threat to chill or prevent the plaintiff's pure speech.

**290.** Dr. Spiehs intends to continue to speak at the board meetings engaging in the same speech but fears more censorship in doing so. Dr. Spiehs is considering self-censorship.

**291.** Complaints and disrespectful speech are also facially unconstitutional because it is viewpoint based and an undercover ban on offensive speech. The prohibition on foul language is unconstitutional as applied as to reading portions of books from the USD497 school libraries.

**292.** These presiding board members have failed to follow fair procedures when depriving Plaintiff of his protected liberty interest in expressive activity and religious exercise, and his property interest in access to public meetings and facilities that Kansas law designates as open to the public. This deprivation, carried out through arbitrary warnings, vague prohibitions, and expulsions enforced by law enforcement officers, constitutes a violation of the Due Process Clause of the Fourteenth Amendment.

**293.** Whatever complaints, disrespectful and foul speech means, it constitutes protected speech. And it is not possible to "disrupt" a board meeting when the speaker is speaking during his or her allotted time.

**294.** BCBI refers to "rules for public comment" but does not provide notice to the public as to what those rules are. The BCBI policy actually publicizes no speaking restrictions for the public comment at an open meeting.  Instead, it states "The rules for public comment shall be available from the clerk of the board prior to the board meeting and at the meeting itself."

**295.** There is nothing in the USD497 agenda minutes that indicate that whatever the clerk possesses as "rules for public comment" have been voted upon and approved by a majority of USD497 board members.  Neither the Board, its clerk, nor its presiding President can create ad hoc public speaking rules without setting those proposed rules for Agenda, discussion, and conduct a proper majority vote approving.  Thus there are no rules limiting the subject matter or content of speech at a USD497 open meeting of the Board.

**296.** Rather than identify or provide notice of the rules in its published policy manual, the Board purports to create rules for public comment pursuant to an inapplicable policy governing long-range goals for guiding the operations of the district.

**297.** To constitute policy of the Board, including public comments, the Board has set out its own requirements for that which does not provide for defendant Jones or Ross

to unilaterally create additional restrictions or guidelines for individuals speaking during the Board's open meetings.

**298.** There is nothing in any Board Policy that gives the defendant Ross or Kelly authority to ban individuals from speaking at or attending the Board's open meetings, to terminate the Webex connection, or to otherwise place restrictions to that right because a speaker merely said the words "bitch," "shit," "shitty," fuck," or "motherfucker."

**299.** Because no rules of public comment were duly adopted by majority vote of the USD497 Board and because no existing Board policy authorizes the defendants Jones, Ross, or Swift to create, enforce, or expand such restrictions, the warnings, bans, and expulsions imposed upon Plaintiff are ultra vires, void, and unconstitutional. These actions deprived Plaintiff of notice, fair procedure, and equal access to a public forum in violation of the Due Process Clause of the Fourteenth Amendment and the Free Speech Clause of the First Amendment.

**300.** The plaintiff presented no emergency or danger to anyone in the events described in this Complaint.

**301.** Each defendant has deprived this plaintiff of a property and liberty interest without due process of law.

**302.** Procedural due process requires both notice and an opportunity to be heard at a meaningful time and in a meaningful manner.

**303.** This policy, custom, and practice of using Lawrence City police to enforce defendant Jones speaking policies improperly criminalizes a purported board

requirement. Banning the person for these purported violations of speech from not only the open meeting but the building is irrational, excessive, and provides no due process for these extreme adverse consequences. These policies and customs are unconstitutionally void and unenforceable as they violate the First Amendment rights of free speech and petition, and the Fourteenth Amendment's guarantee of due process against vague laws.

**304.** Being a traditional public forum regarding the areas the plaintiff was removed or banned from, the government's right to restrict expressive activity is sharply circumscribed and must satisfy strict scrutiny. Nothing in these policies or municipal code, or the way they were applied, contained any procedures to provide notice or contest the adverse consequences. It is an affront to due process that these presiding officials would put into place a policy and custom in which public speakers such as the plaintiff can be deprived of their First Amendment rights with no opportunity to be heard.

**305.** And given the fact that the board members, with its president, purportedly empowered its presiding board member to unilaterally exclude and declare a criminal trespass which they knew meted out criminal consequences, this policy and custom increased the risk of retaliatory or ad hoc deprivation.

**306.** The plaintiff has been damaged.

### THIRD CAUSE OF ACTION
### AS APPLIED CHALLENGE SEEKING DECLARATORY AND INJUNCTIVE RELIEF AGAINST DEFENDANTS USD497, SWIFT, JONES, AND ROSS
### ( 42 U.S.C. § 1983)

**307.** Plaintiff repeats and realleges each of the allegations contained in the foregoing paragraphs of this Complaint as if fully set forth herein.

**308.** The right to petition the government for a redress of grievances is one of the most precious of the liberties safeguarded by the Bill of Rights, and is high in the hierarchy of First Amendment values. The right to petition the government for redress of grievances is such a fundamental right as to be implied by the very idea of a government, republican in form.

**309.** A petition may consist of a personal grievance addressed to the government and may be an oral grievance.

**310.** The public comment period at school board meetings is a forum that enables people to exercise their fundamental First Amendment right to petition their elected government officials.

**311.** All of plaintiff's public speech at Board meetings is fully protected by the First Amendment right to petition the government for a redress of grievances.

**312.** As-applied against this Plaintiff, the Board's Speech rules and practices regarding complaints, being disrespectful, interpreting protected speech as being dangerous or unsafe, obscene or foul language violated and continue to violate plaintiff's First Amendment right to petition by impermissibly discriminating against his petitions on the basis of his viewpoint.

62. As-applied against this Plaintiff, the Board's Speech rules and practices also violate plaintiff's First Amendment rights because these prohibitions are not reasonable in light of the public comment period's purpose. Petitioning a school board

for a redress of grievances will necessarily require referencing individuals – especially members of the school board, questioning them, repeating the words contained in the school curriculum.

**313.** The BCBI policy actually publicizes no speaking restrictions for the public comment at an open meeting.  Instead, it states the "rules for public comment shall be available from the clerk of the board prior to the board meeting and at the meeting itself."

**314.** The BCBI policy actually restricts Jones and Ross in interacting with speakers yet Jones and Ross violate that restriction repeatedly by interrupting speakers during their allotted time as set forth in this Complaint.

**315.** The restrictions imposed by defendants Jones and Ross, including labeling plaintiff's speech as "complaints," "disrespectful," "foul language," or "unsafe," and the subsequent termination of his remarks or Webex feed, were applied in a discriminatory and retaliatory manner based solely on the viewpoint expressed.

**316.** The Board's practices are not narrowly tailored to serve any significant governmental interest, nor are they the least restrictive means of preserving order or decorum at public meetings.

**317.** By contrast, other speakers favorable to the Board or aligned with its viewpoints were allowed to speak without interruption or sanction, even when referencing the same or similar subject matter, demonstrating defendants' actions were viewpoint-based.

**318.** Defendants' conduct in terminating Plaintiff's public comment time, expelling him from meetings, and restricting his access to Board proceedings chills and deters his exercise of the fundamental right to petition the government.

**319.** The application of these practices and speech restrictions against Plaintiff is unconstitutional under the First and Fourteenth Amendments, and unless enjoined, Defendants will continue to enforce such practices to Plaintiff's ongoing injury.

**320.** The USD497 president Ross and Jones' speaking restrictions purports to restrict "foul" language which its definition is unknown, overinclusive, and underinclusive.

**321.** This forum is a designated public forum.

**322.** The BCBI policy contains no restrictions as to "foul" language or the use of the words "bitch," "shit," "shitty," fuck," or "motherfucker."

**323.** The BCBI policy, as applied to the plaintiff by defendant Jones, is unconstitutionally vague, and includes a substantial number of their respective applications which are largely unconstitutional and do not substantially outweigh their plain legitimate sweep. The current speaking policy being practiced, created or enforced by defendant Swift, Jones, and Ross hinders the plaintiff's ability to speak, to create, to publish, and to distribute speech. These policy restrictions restricts and chills the plaintiff' speech by preventing him from obtaining the benefit of public speaking and attending meetings in person.

**FOURTH CAUSE OF ACTION**
**RIGHT OF FREE SPEECH, RETALIATION U.S. CONST. AMENDS. I, XIV, 42 U.S.C. § 1983**
**AS-APPLIED CHALLENGE TO THE PUBLIC PARTICIPATION POLICY AGAINST USD497,**
**KELLY JONES, RONALD ROSS, AND JEANINE SWIFT**

**324.** Plaintiff restates and incorporates by reference the allegations in the above paragraphs.

**325.** Dr. Spiehs engaged in constitutionally protected speech when he attended open public meetings of the Board of Education to voice his opinions and express disagreement with Defendants' policies and actions.

**326.** Dr. Spiehs was prevented, chilled, and inhibited from engaging in constitutionally protected First Amendment activity as a result of the Ban, because the Ban prevented him from attending and speaking at open public meetings of the Board of Education, public sporting events, and church activities on Sunday which are held on School District property.

**327.** Defendants, by removing or otherwise banning Dr. Spiehs from these meetings violated Dr. Spiehs's free-speech rights under the First Amendment because the Ban unlawfully restrained Dr. Spiehs's speech and participation in a public forum on matters of public interest and concern.

**328.** Restrictions on speech in limited public forums must be both reasonable in light of the forum's purpose and viewpoint neutral.

**329.** The Ban burdened substantially more speech than was necessary for the School District to achieve any legitimate interest, failed to leave open alternative avenues for expression, and was unreasonable in light of the purpose of the forums.

**330.** Defendants' knowledge of Dr. Spiehs's criticisms and the timing and length of the Ban demonstrate that the Ban was motivated by Defendants' disagreement with

Dr. Spiehs's opinions and criticisms of School District policies and actions. The Ban thus also constituted unlawful viewpoint discrimination.

**331.** The Ban on Dr. Spiehs further operated as an unconstitutional prior restraint on Dr. Spiehs's speech because it prevented him from speaking at Board meetings absent permission from Superintendent Swift.

**332.** The permission requirement delegated unfettered discretion to a single official and constituted an unlawful prior restraint on Dr. Spiehs's speech.

**333.** Dr. Spiehs was forced to alter his constitutionally protected activities to avoid further adverse actions from the School District.

**334.** Until they were enjoined by this Court, Defendants continued to violate the First Amendment rights of Dr. Spiehs by enforcing the Ban.

**335.** The retaliatory motive is further evidenced by Defendants' repeated pattern of issuing "warnings" to Dr. Spiehs only when his speech criticized the Board or repeated language drawn directly from USD497 library books, while allowing other speakers aligned with Defendants' positions to continue without sanction.

**336.** Defendants' use of law enforcement presence at Board meetings to enforce ejections and their practice of terminating Plaintiff's Webex connection prior to the expiration of his allotted speaking time further chilled and deterred his exercise of constitutionally protected rights.

**337.** The combination of the Ban, the "warning" system, and the discretionary permit requirement operated as a scheme of intimidation and retaliation against Plaintiff for engaging in protected speech critical of USD497.

**338.** Defendants' actions were taken under color of state law and deprived Plaintiff of his rights secured by the First and Fourteenth Amendments to the United States Constitution.

**339.** As a direct and proximate result of Defendants' unconstitutional conduct, Plaintiff has suffered damages including, nominal damages, reputational harm, loss of First Amendment freedoms, and the chilling of his religious and political expression.

**340.** Protected Activity. Plaintiff engaged in constitutionally protected activity when he criticized USD497 policies, quoted from district library books, questioned Board members' decisions, and petitioned his government during the public comment period at Board meetings.

**341.** Adverse Action. Defendants took adverse actions against Plaintiff by:

    a.  issuing arbitrary "warnings" and cutting off his microphone;

    b.  terminating his Webex connection before his allotted time expired; and

    c.  imposing a sweeping Ban that prohibited him from attending school board meetings, school events, and even church services held on USD497 property.

**342.** Causal Connection. The temporal proximity between Plaintiff's criticisms of Board members and policies and the issuance of warnings, disconnections, and the Ban demonstrates that the adverse actions were motivated by Defendants' disagreement with Plaintiff's viewpoints. Defendants' selective enforcement of

alleged "rules" against Plaintiff, while allowing favored speakers to proceed uninterrupted, further confirms this retaliatory intent.

**343.** Defendants' retaliatory actions would chill a person of ordinary firmness from continuing to engage in the protected activity of petitioning the government and exercising First Amendment rights.

**344.** Accordingly, Defendants' conduct constitutes unlawful retaliation in violation of the First and Fourteenth Amendments.

343. Plaintiff seeks declaratory and injunctive relief preventing Defendants from enforcing the Ban, the prior permission requirement, and the retaliatory practices described herein, as well as nominal and compensatory damages for past violations of his constitutional rights.

Caselaw clearly established that restrictions on speech in a limited public forum must be reasonable and view-point neutral. Bans are only reasonable upon situations of threat, constant harassment, or consistent disruption.

**345.** Defendants have engaged in retaliatory viewpoint discrimination against Dr. Spiehs. Viewpoint discrimination is clearly prohibited. It is well settled that viewpoint discrimination is a clearly established violation of the First Amendment in any forum. Dr. Spiehs was repeatedly interrupted during his allotted three minutes of speaking time.

**346.** Thus, every reasonable government official would have understood that terminating Dr. Spiehs during his Webex connections then not merely muting (but allowing him to remain in meeting) then instead removing him from the building and

117

parking lot, (then banning him for a lifetime when no dangerous or unsafe behavior occurred) because of the viewpoints expressed therein violates the First Amendment. Thus, these defendants engaged in viewpoint discrimination irrespective of whether they were following any Board policy.

**347.** First Amendment protections extend to public speech at school board meetings, by operation of the Fourteenth Amendment.

**348.** It is axiomatic that criticism of school officials, school employees, school policies, rules, and regulations, school budgets, and school curricula are germane to the business of school boards – regardless of whether school board members want to hear such criticism or believe that it is fair. The First Amendment prohibits the exclusion of these viewpoints from public speech at Board meetings.

**349.** All of Plaintiff's public speech at Board meetings is fully protected by the Free Speech Clause of the First Amendment.

**350.** At no point did Defendants terminate or censor plaintiff's speech on the basis of time, irrelevance to the forum or lack of decorum, or because it was truly obscene. Rather, Defendants censored plaintiff's speech because they disagreed with it.

**351.** As-applied against the plaintiff, the practices and policy prohibitions on being disrespectful, making complaints, using "foul" language violated and continue to violate plaintiff's First Amendment right of free speech by impermissibly discriminating against their speech on the basis of its viewpoint.

**352.** As-applied against this Plaintiff, the custom, practices, and policy prohibitions including the two-warnings practice also violate plaintiff's First Amendment rights

because these prohibitions are not reasonable in light of the public comment period's purpose. Discussion of matters relevant to the schools' operations and curriculum will necessarily require referencing the purported "foul" or "obscene" language used in the very books the school district provides to students. Forbidding these comments impermissibly discriminates against plaintiff's speech on the basis of viewpoint.

**353.** Dr. Spiehs's claims under the Free Exercise Clause are also concomitant with his First Amendment Free Speech claim and right to petition government claim.

**354.** Defendants do not require citizens to ask USD497 permission to attend church on any given Sundays on school property – except for Dr. Spiehs and Ms. Schmidt.

**355.** Defendants do not ban citizens from participating or attending church services occurring on USD497 school property except for Dr. Spiehs, Ms. Schmidt, and Mr. Eravi.

**356.** Defendants' conduct, as applied to Plaintiff, is not only a content-based and viewpoint-based restriction on speech but also an impermissible burden on the free exercise of religion. By requiring Plaintiff to obtain prior permission to attend church services, by conditioning his access on arbitrary limitations of time and manner, and by selectively enforcing bans and speech codes against him while allowing other community members unfettered participation, Defendants have created a discriminatory regime that violates the Free Speech, Free Exercise, and Petition Clauses of the First Amendment, as incorporated by the Fourteenth Amendment.

**357.** In the contracts with churches USD497 does not reserve the right to interfere with that church's ability to make its services open to everyone in the public yet

USD497 interferes in prohibiting attendance, or prohibiting attendance unless permission is obtained, and in limiting Dr. Spiehs's an unlimited range of participation in the church as other individuals have the right to do.

**358.** These named defendants have favored certain expressions of religion while disfavoring others in contravention of the Establishment Clause.

**359.** The defendants deem the expression of religion favorable when it comes to attending a church service but not an exercise of religion when it comes to volunteering or fellowshipping with other fellow Christians before or after a "church service."

**360.** These defendants actions burden Dr. Spiehs's religious exercise in the same manner as described in Count 1.

**361.** Accordingly, the same set of facts that support Plaintiff's claims under the KPRFA also demonstrate an Establishment Clause violation: Defendants have arrogated to themselves the authority to define the contours of religious exercise on USD497 property, privileging attendance at a fixed "service" while burdening or prohibiting other core aspects of Christian fellowship and ministry, such as volunteering, ministering, or associational engagement.

**362.** The Establishment Clause forbids government entities from favoring some religious expressions while burdening others, or from arrogating to themselves the authority to define what constitutes "valid" religious exercise.

**363.** By conditioning Plaintiff's church attendance on prior written permission, and by limiting his religious participation to the precise start and end of a "service,"

Defendants have impermissibly established government-favored contours of religious practice.

**364.** Defendants further violated the Establishment Clause by privileging mere attendance at a service as "religion," while disfavoring and burdening equally core expressions of religious exercise, including fellowship, ministry, volunteering, and associational engagement before and after the service.

**365.** Defendants' actions impermissibly entangle government in theological determinations about what is or is not "church" and convey to a reasonable observer that certain religious expressions are favored while others are disfavored.

**366.** Defendants' actions are not neutral or generally applicable; they discriminate specifically against Plaintiff's religious exercise while allowing all other members of the public to attend, participate, and fellowship in Free City Church services on USD497 property without prior restraint.

**367.** Defendants' Establishment Clause violations, taken together with the bans and speech restrictions alleged herein, constitute unlawful government endorsement of certain religious practices while burdening others.

**368.** Plaintiff has suffered and continues to suffer irreparable harm from Defendants' unconstitutional Establishment Clause violations and is entitled to declaratory and injunctive relief, nominal damages, and attorney's fees under 42 U.S.C. § 1988.

**369.** Defendants knew of Dr. Spiehs's criticisms, disapproved of them, and banned Dr. Spiehs shortly after he lodged those criticisms, preventing him from – among

other things – speaking at open public meetings of the Board of Education and from attending school events, such as athletic games, that are open to the public.

370. Defendants banned Dr. Spiehs from open public meetings of the Board of Education and from presence on other District property for his lifetime in retaliation for his constitutionally protected speech.

371. The Ban imposed upon Dr. Spiehs was motivated by his constitutionally protected activities, namely his criticisms of Superintendent Swift, the School District, and Board of Education policies at multiple Board meetings.

372. Requiring Dr. Spiehs to request permission to enter public USD497 property, including for purposes of attending church or open meetings, constitutes a prior restraint on his speech, because he has a right to engage in expressive activity in places where members of the public have a lawful right to assemble and participate.

373. Defendants' selective enforcement of their purported "speech policy" further demonstrates unconstitutional retaliation. Defendants do not interrupt or eject speakers who express favorable viewpoints, but they do enforce the policy against Plaintiff when his viewpoints are critical of Defendants, their curriculum, or their policies.

374. This selective enforcement – together with threats of criminal prosecution, physical removal from Board meetings and school property, bans from all USD497 property, and permission requirements uniquely imposed on Plaintiff – shows that Defendants acted under color of law to suppress disfavored viewpoints.

**375.** By removing and banning Plaintiff, by conditioning attendance on permission, and by defining what religious participation is "valid," Defendants USD497, through its officers, directors, managing agents, or employees, including but not limited to Defendants Swift, Jones, and Ross, deprived Plaintiff of his rights to free speech, free exercise of religion, and petition, in violation of the First and Fourteenth Amendments to the United States Constitution.

**376.** Accordingly, Plaintiff is entitled to nominal damages, declaratory relief, preliminary and permanent injunctive relief prohibiting continued enforcement and maintenance of Defendants' unconstitutional customs, policies, and practices, as well as attorney's fees and expenses pursuant to 42 U.S.C. § 1988.

<div align="center">

**PRAYERS FOR RELIEF**

</div>

A.  Declaratory and injunctive relief as described in all Counts.

B.  An award of actual damages to the plaintiff. Plaintiff seeks an order awarding compensatory damages against the defendants for violation of his state and federal constitutional rights in the amount in excess of $75,000.

C.  An award of nominal damages to the plaintiff.

D.  Against each individual defendant in their individual capacity an award of punitive and exemplary damages to the plaintiff. Punitive damages are appropriate where conduct is shown to be motivated by evil motive or intent or involves reckless or callous indifference which has been alleged as to each individual defendant in this lawsuit.

E.   Cost of suit, including attorney fees and costs pursuant to 42 U.S.C. § 1988 and any other relief as the Court deems just and appropriate.

F.   Other relief as the Court deems appropriate.

**DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by Jury on all causes of action.

<div style="text-align: right">

/s/Linus L. Baker
Linus L. Baker, KS 18197
6732 West 185th Terrace
Stilwell, KS  66085-8922
Telephone:  913.486.3913
Fax:          913.232.8734
E-Mail: linusbaker@prodigy.net
Attorney for the plaintiff

</div>